(Slip Opinion) OCTOBER TERM, 2020 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HOLLYFRONTIER CHEYENNE REFINING, LLC, ET AL. *v.* RENEWABLE FUELS ASSOCIATION ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 20–472. Argued April 27, 2021—Decided June 25, 2021

When Congress created the renewable fuel program (RFP) requiring most domestic refineries to blend renewable fuels into the transportation fuels they produce, see 42 U. S. C. §7545(*o*)(1)(J), (*o*)(1)(L), (*o*)(2)(A)(i), it added features designed to lessen the impact of the program's mandates on small refineries. At the outset, Congress created a blanket exemption from RFP obligations for all small refineries until 2011. §7545(*o*)(9)(A)(i). Congress also directed the Environmental Protection Agency (EPA) to "extend the exemption under clause (i)" for at least two years if the RFP obligations would impose "a disproportionate economic hardship" on a given small refinery. §7545(*o*)(9)(A)(ii). Finally, Congress offered the possibility of further relief in future years by providing that "[a] small refinery may at any time petition . . . for an extension of the exemption under subparagraph (A) for the reason of disproportionate economic hardship." §7545(*o*)(9)(B)(i).

Here, three small refineries initially received an exemption, saw it lapse for a period, and then again petitioned for an exemption under subparagraph (B)(i). EPA granted the exemptions, and a group of renewable fuel producers objected. The Tenth Circuit vacated EPA's decisions, concluding that the small refineries were ineligible for an "extension" under subparagraph (B)(i) because they had allowed previous exemptions to lapse.

*Held*: A small refinery that previously received a hardship exemption may obtain an "extension" under §7545(*o*)(9)(B)(i) even if it saw a lapse in exemption coverage in a previous year. Pp. 4–16.

 (a) The key term here—"extension"—is not defined in the statute.

Sometimes it can refer to an increase in time. 5 Oxford English Dictionary 597. Other times it can refer to the act of offering or making something available, such as the granting of a benefit. *Id.,* at 595. Here, three textual clues show subparagraph (B)(i) uses "extension" in its temporal sense. First, subparagraph (A)(i)'s initial exemption is described temporally (as lasting "until calendar year 2011"). Second, subparagraph (A)(ii)'s exemption is also described temporally—authorizing EPA to "extend the exemption under clause (i) . . . for a period of not less than 2 years." Finally, subparagraphs (A)(ii) and (B)(i) share an identical title—"Extension of exemption"—underscoring the likelihood that the two neighboring provisions use the term "extension" in one consistent sense. Pp. 4–5.

(b) Subparagraph (B)(i)'s temporal use of "extension," however, does not require unbroken continuity. The Tenth Circuit erred by imposing such a requirement here and concluding that a small refinery is permanently ineligible for an extension once an exemption lapses. Pp. 6–12.

(1) The plain meaning of "extension" does not require unbroken continuity. Dictionary definitions contemplate the possibility of resumption after an interruption. Federal rules permit litigants to seek (and courts to grant) an "extension" of time even after a lapse. See 28 U. S. C. §2107(c); Fed. Rule Civ. Proc. 6(b)(1). And recent federal statutes provide an "extension" of benefits that previously expired months or even years earlier. See Pub. L. 116–260, §203, 134 Stat. 1182; Pub. L. 116–136, §2114, 134 Stat. 281. Pp. 6–8.

(2) A different statutory context might make for a different outcome, for example, where Congress uses modifying language requiring an extension to be "consecutive" or "successive." See, *e.g.,* 8 U. S. C. §1184(g)(8)(D). But the statutory context here confirms the best reading of subparagraph (B)(i) does not require unbroken continuity. The absence of any "consecutive" or "successive" language suggests exemptions need not follow one another without interruption. By authorizing small refineries to seek a hardship exemption "at any time," subparagraph (B)(i) points to an expansive meaning that invites small refineries to seek hardship exemptions in different years as market conditions change. And subparagraph (A), the immediately preceding paragraph, contemplates extension of exemption coverage even after interruption. See 42 U. S. C. §7545(*o*)(1)(K), (*o*)(9)(A)(i), (*o*)(9)(A)(ii). Before the Tenth Circuit, EPA pressed a similar argument by pointing to a 2014 regulation, 40 CFR §80.1441(e)(2)(iii), and asking for deference under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837. Because "the government is not invoking *Chevron*" now, the Court declines to consider whether any deference is due. Pp. 8–11.

(3) Respondents contend the statute establishes a general sunset

scheme and that any exemptions were meant to end rapidly. They note that subparagraph (A) is titled "temporary exemption," that it was permitted to expire in 2013, and that subparagraph (B)(i) speaks of extending "the exemption under subparagraph (A)." Context, however, suggests subparagraph (B) is not part of some sunset scheme. Subparagraph (A)(ii)'s exemptions did not have to expire in 2013; they could have lasted indefinitely. Subparagraph (B)(i)'s "at any time" language expressly contemplates exemptions beyond 2013. That looks nothing like readymade examples of sunset schemes, which Congress eschewed here. *E.g.,* §247d–7f(b). Finally, even on respondents' reading, a small refinery with an unbroken record of failing to comply with the RFP may continue to seek and obtain extensions forever. Pp. 11–12.

(c) In an appeal to public policy, respondents argue that subparagraph (B) was adopted to "funnel small refineries toward compliance over time" and that enforcing a continuity requirement helps advance that goal. Consistent with that view, the Tenth Circuit concluded the number of small refinery exemptions "should have tapered down" over time. Petitioners counter that the statute seeks to increase production of renewable fuel while offering an annual "safety valve" for small refineries. Neither the statute's text, structure, nor history affords sufficient guidance to choose between these competing narratives and metaphors. Instead, the analysis can be guided only by the statute's text—and that nowhere commands a continuity requirement. Pp. 12–16.

948 F. 3d 1206, reversed.

GORSUCH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, BREYER, ALITO, and KAVANAUGH, JJ., joined. BARRETT, J., filed a dissenting opinion, in which SOTOMAYOR and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———

No. 20–472

———

## HOLLYFRONTIER CHEYENNE REFINING, LLC, ET AL., PETITIONERS *v.* RENEWABLE FUELS ASSOCIATION, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

[June 25, 2021]

JUSTICE GORSUCH delivered the opinion of the Court.

Congress requires most domestic refineries to blend a certain amount of ethanol and other renewable fuels into the transportation fuels they produce. But when it first adopted these mandates, Congress temporarily exempted small refineries across the board. Looking beyond that initial period, Congress authorized individual small refineries to apply for additional hardship "extensions" from the federal government "at any time." The question before us is whether a small refinery that manages to comply with renewable fuel mandates in one year is forever forbidden from applying for an "extension" in any future year.

I

In 2005 and 2007, Congress created the renewable fuel program (RFP). §§201, 202(a)(1), 121 Stat. 1519, 42 U. S. C. §7545(*o*)(1)(J), (*o*)(1)(L), (*o*)(2)(A)(i). For 2006, Congress ordained the inclusion of 4 billion gallons of renewable fuel in the Nation's fuel supply. §7545(*o*)(2)(B)(i)(I). By 2022, the number will climb to 36 billion gallons. *Ibid.*

For years after that, Congress has largely left it to the Environmental Protection Agency (EPA) to set the applicable volumes. §7545(*o*)(2)(B)(ii).

From the start, EPA has apportioned the nationwide volume mandates into individualized ones for each refinery. §7545(*o*)(3)(B); 40 CFR §80.1407(a) (2020). The Agency polices these mandates with a system of credits. Each credit represents the blending of a certain quantity of renewable fuel. 42 U. S. C. §7545(*o*)(5)(A)(i); 40 CFR §§80.1415, 80.1429. A refinery that blends renewables may either "retire" the credits it has earned (*i.e.*, use them) to satisfy its own RFP volume obligation—or sell those credits to a different producer that needs them. 42 U. S. C. §7545(*o*)(5)(B); 40 CFR §§80.1425–80.1427. Any given refinery may therefore comply with the law thanks to its own blending efforts, the purchase of credits from someone else, or a combination of both.

Congress tempered its mandates in other ways too. For example, if a refinery is unable to generate or purchase sufficient credits in a given year, it may "carry forward" any deficit to the following year. 42 U. S. C. §7545(*o*)(5)(D). But this reprieve has a snowball effect. The next year, the refinery must offset the deficit it carried forward. §7545(*o*)(5)(D)(ii). Elsewhere, Congress authorized more sweeping relief: EPA may waive RFP obligations in a particular State or region if it determines they "would severely harm the economy or environment" or if "there is an inadequate domestic supply." §7545(*o*)(7)(A). That waiver lasts for only one year, "but [it] may be renewed." §7545(*o*)(7)(C).

Most important for our case, however, is a different, if related, set of tempering features. Evidently, Congress was concerned that escalating RFP obligations could work special burdens on small refineries that lack the "inherent scale advantages of large refineries," *Sinclair Wyoming Refining Co.* v. *EPA*, 887 F. 3d 986, 989 (CA10 2017), and

sometimes supply a major source of jobs in rural communities, Brief for State of Wyoming et al. as *Amici Curiae* 19–25. To protect small refineries that produce (on average) fewer than 75,000 barrels a day "for a calendar year," §7545(*o*)(1)(K), Congress created a blanket exemption from RFP obligations "until calendar year 2011," §7545(*o*)(9)(A)(i). Congress also directed EPA to "extend the exemption under clause (i)" for at least two years if the Secretary of Energy determined RFP obligations would impose "a disproportionate economic hardship" on a given small refinery. §7545(*o*)(9)(A)(ii). Accordingly, subparagraph (A) anticipated temporary relief until 2011 or at least 2013. In the next subparagraph, the one most squarely at issue before us, Congress offered the possibility of still further relief in future years: "A small refinery may at any time petition the Administrator for an extension of the exemption under subparagraph (A) for the reason of disproportionate economic hardship." §7545(*o*)(9)(B)(i).

Here's how things played out for small refineries once the law went into effect. Under subparagraph (A)(i), all small refineries were exempt through 2010. See Dept. of Energy, Office of Policy and International Affairs, D. Vashishat et al., Small Refinery Exemption Study 25 (Mar. 2011). In 2011, EPA extended that exemption for 13 small refineries under subparagraph (A)(ii)—and it extended the exemption for an additional 11 small refineries under subparagraph (B)(i). *Id.*, at 37. As time went on, and as economic conditions fluctuated, EPA extended more exemptions under subparagraph (B)(i) in some years than in others. For example, EPA granted 8 extensions in 2013, but expanded that number to 31 in 2018. EPA, RFS Small Refinery Exemptions, (May 20, 2021), https://www.epa.gov/fuels-registration-reporting-and-compliance-help/rfs-small-refinery-exemptions.

This case concerns three small refineries that initially received an exemption, saw it lapse for a period, and then

petitioned for an exemption again under subparagraph (B)(i). HollyFrontier Woods Cross Refining LLC received only the blanket exemption under subparagraph (A)(i) through 2010. See *Renewable Fuels Assn.* v. *EPA*, 948 F. 3d 1206, 1228 (CA10 2020). Wynnewood Refining Company received the blanket exemption under subparagraph (A)(i) and a 2-year extension under subparagraph (A)(ii) through 2012. *Id.,* at 1229. HollyFrontier Cheyenne Refining LLC received subparagraph (A)(i)'s blanket exemption, subparagraph (A)(ii)'s 2-year extension, and then subparagraph (B)(i)'s hardship exemption in 2015. *Id.*, at 1227. After a lull, all three refineries petitioned for a hardship exemption under subparagraph (B)(i) in 2017 or 2018. EPA granted all three.

A group of renewable fuel producers objected. They petitioned for review of EPA's decisions in the Tenth Circuit, arguing the Agency acted "in excess of statutory jurisdiction, authority, or limitations" by granting the petitions. 5 U. S. C. §706(2)(C). The court vacated EPA's decisions. It concluded the refineries were ineligible for an "extension" of their exemptions because all three had allowed their exemptions to lapse at some point in the past. 948 F. 3d, at 1249. We granted review to consider the question for ourselves. 592 U. S. ___ (2021).

## II

### A

Where Congress does not furnish a definition of its own, we generally seek to afford a statutory term "its ordinary or natural meaning." *FDIC* v. *Meyer*, 510 U. S. 471, 476 (1994). Before us, the parties agree on one thing: The key word here—"extension"—is nowhere defined in the statute and it can mean different things depending on context.

Sometimes, as the renewable fuel producers observe and the court of appeals held, an "extension" can refer to an increase in time. See, *e.g.*, 5 Oxford English Dictionary 597

(2d ed. 1989) (OED) ("Enlargement in duration"); 7 U. S. C. §940f(a) ("extension of the final maturity" of a federal loan). In other settings, as the small refineries emphasize, an "extension" can mean the offering or making something available to someone, such as the granting of a benefit. See, *e.g.*, 5 OED 595 ("[t]o hold out, accord, grant"); 15 U. S. C. §1141e(a) ("extension of [intellectual property] protection"). These definitional differences matter too. If Congress used the term in the second sense, everyone before us seems to accept the court of appeals erred: Just because a small refinery's first exemption lapsed, nothing would foreclose the government from extending—in the sense of granting or conferring—a second exemption later.

Ultimately, however, we agree with the renewable fuel producers and the court of appeals that subparagraph (B)(i) uses "extension" in its temporal sense—referring to the lengthening of a period of time. We find three textual clues telling. First, the initial exemption described in subparagraph (A)(i) is described temporally (as lasting "until calendar year 2011"). 42 U. S. C. §7545(*o*)(9)(A)(i). Second, the next exemption described in subparagraph (A)(ii) speaks temporally too, and it does so using a variation of the very term in dispute—authorizing EPA to "*extend* the exemption under clause (i) for the small refinery for a period of not less than 2 years." §7545(*o*)(9)(A)(ii)(II) (emphasis added). Finally, subparagraph (A)(ii) and subparagraph (B)(i) share an identical title—"Extension of exemption"—underscoring the likelihood that the two neighboring provisions use the term "extension" in one consistent sense. Nor do we see any persuasive countervailing evidence that Congress meant to adopt one meaning of the term in subparagraph (A)(ii) and a different one next door in subparagraph (B)(i). See *Henson* v. *Santander Consumer USA Inc.*, 582 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 5) (absent contrary evidence, this Court normally presumes consistent usage).

## B

Resolving that much, however, does not resolve this case. Really, it only takes us to the heart of the dispute. The Tenth Circuit didn't just hold that an extension means an increase in time—it imposed a continuity requirement. On that court's view, a small refinery becomes permanently ineligible for a further extension of time once its exemption lapses. Even accepting that subparagraph (B)(i) uses the term "extension" in its temporal sense, the small refineries submit this was error. On their view, small refineries whose exemptions have lapsed in one year may still seek an "extension" in a following year. Indeed, the small refineries candidly characterize this as their stronger argument for reversal.

We agree. It is entirely natural—and consistent with ordinary usage—to seek an "extension" of time even after some lapse. Think of the forgetful student who asks for an "extension" for a term paper after the deadline has passed, the tenant who does the same after overstaying his lease, or parties who negotiate an "extension" of a contract after its expiration. Perhaps for reasons like these, the respondents and court of appeals are unable to point to a single dictionary definition of the term "extension" requiring unbroken continuity. To be sure, some definitions speak of an extension as a "continuation." See, *e.g.*, Black's Law Dictionary 703 (10th ed. 2014) (defining "extension" as "[t]he *continuation* of the same contract for a specified period" (emphasis added)). And the dissent urges us to read "extension" to mean "continuation." *Post*, at 2 (opinion of BARRETT, J.). But even *that* term can denote a resumption after some interrupting lapse. See, *e.g.*, 3 OED 828 (defining "continuation" as "the resumption of any interrupted action or course"); Webster's New Collegiate Dictionary 180 (1946) (defining "continuation" as the "[a]ct of continuing; esp. a resumption"); B. Garner, Modern English Usage 214 (4th ed. 2016).

Much federal law proceeds on this same understanding. Under certain circumstances, a court "may . . . extend" a party's "time for appeal" even "after the expiration of the time otherwise set for bringing appeal." 28 U. S. C. §2107(c). In other words, the timer can start, run, finish, and then *restart*—because a court has the power to "extend" the time allotted even after a lapse. Likewise, the Federal Rules of Civil Procedure prescribe all sorts of rules about "[w]hen an act may or must be done within a specified time" in trial court proceedings. Fed. Rule Civ. Proc. 6(b)(1). And for almost all rules prescribing a deadline, a district court may "extend the time" even "after the time has expired." *Ibid.*; cf. Fed. Rule Civ. Proc. 6(b)(2). More than a few lawyers and clients have taken advantage of "extensions" of just these sorts.

Still other examples exist. Maybe most notably, just last year Congress twice passed laws providing for the "extension" of public benefits that had lapsed or been interrupted. See Consolidated Appropriations Act of 2021, Pub. L. 116–260, §203, 134 Stat. 1182 (providing an "extension" of unemployment compensation starting on December 26, 2020, after lapsing on July 31, 2020); Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116–136, §2114, 134 Stat. 281 (providing an "extension" of unemployment benefits starting in 2020, after lapsing in 2013). The dissent gives these particular examples short shrift because they appear in statutes "passed in an emergency context" a decade after the statute at issue here. *Post*, at 7. We do not doubt that meaning may change with time, but unless the dissent thinks the ordinary meaning of "extension" changed in just 10 years, it's hard to understand why these enactments don't shed at least some light on today's question. If anything, the emergency context in which these laws were passed—forcing legislators to use a term on short notice— would seem to provide useful evidence of ordinary meaning.

Beyond that, the dissent counters by attempting to recast

all these varied examples of temporal extensions after in-
terruption.  It imagines, for example, that when a teacher
extends a paper deadline after a lapse, that act of grace al-
ways operates like a *nunc pro tunc* judicial decree—retro-
actively deeming the time originally allotted as now extend-
ing continuously to some new and future due date.  But no
one thinks extensions always work this way.  As the
COVID-19 statutes illustrate, a previously lapsed benefit
can and sometimes is "extended" for a new period without
any retroactive effect.  Likewise, if a student misses the 4
p.m. deadline on Friday, his teacher may extend the dead-
line by authorizing him to hand in his paper the following
Monday between 8 a.m. and 9 a.m.  Besides, even looking
to the *nunc pro tunc* analogy, what does it prove?  It cannot
change the fact that, absent time travel, a lapse or inter-
ruption has occurred.  The student cannot go back in time
and turn in his paper when it was originally due on Friday
afternoon.  His lapse may be forgiven or overlooked, maybe
even with a Latin term invoked in the process, but none of
that means a break in continuity, a lapse, or an interrup-
tion never happened.  See *infra*, at 10, n. 2 (discussing
treatment of a lapse under subparagraph (A)).

We do not mean to suggest that every use of the word
"extension" must be read the same way.  On occasion, for
example, Congress requires "extensions" to be "consecutive"
or "successive."  *E.g.*, 8 U. S. C. §1184(g)(8)(D); 10 U. S. C.
§2304a(f); 19 U. S. C. §2432(d)(1); 28 U. S. C. §594(b)(3)(A).
Modifiers like those may well suggest a continuity require-
ment.  See, *e.g.*, Webster's New Collegiate Dictionary, at
846 (defining "successive" as "following each other without
interruption").  Other contextual clues in a given statute
may yield a similar conclusion.  But none of that means the
bare term "extension" obviously and always includes a
strict continuity requirement.  If anything, the absence of
any parallel modifying language in the statute before us
supplies one clue that continuity is not required here.

Opinion of the Court

Further statutory clues confirm this understanding. Recall that subparagraph (B)(i) authorizes small refineries to seek hardship exemptions "at any time."    42 U. S. C. §7545(*o*)(9)(B)(i).  Far from indicating that a refinery may apply for an exemption in a future year only if it has always received one in the past, this language suggests a much more "expansive meaning." *United States* v. *Gonzales*, 520 U. S. 1, 5 (1997).  "At any time" does not connote a demand for some rigid continuity so much as its opposite—including the possibility that small refineries might apply for exemptions in different years in light of market fluctuations and changing hardship conditions, whether consecutively or otherwise.[1]

We find another feature telling too.  Next door, subparagraph (A) uses the term "extension" *without* a continuity requirement.  To see how subparagraph (A) was designed, imagine a small refinery avails itself of the blanket exemption in 2008 and 2009 under subparagraph (A)(i).  Then in 2010, because of an increase in production capacity, the refinery loses "small refinery" status under §7545(*o*)(1)(K) and with it the blanket exemption that "appl[ies] to small refineries." §7545(*o*)(9)(A)(i).  One year later, production capacity falls and the refinery moves back into small refinery status for 2011.  If that refinery applies for an "extension" under subparagraph (A)(ii), the statute provides that EPA "shall extend the exemption under clause (i)," so long as the Secretary of Energy found the refinery would suffer a

———————

[1] On the dissent's account, this language merely permits a small refinery to seek an extension for the following year *after* EPA's November 30 deadline for publishing the coming year's RFP mandates. *Post*, at 10–11.  But to pursue this interpretation we would effectively have to read words into the statute.  A provision promising small refineries that they may seek an extension "at any time" would become a provision promising them only the chance to seek an extension "*for the following year* at any time *before or after EPA's November 30 deadline for publishing next year's RFP mandates.*"

disproportionate hardship. The result? A refinery may receive an "extension" despite its exemption having lapsed. And if that's how the term is used in subparagraph (A), we would once again expect subparagraph (B) to follow a consistent pattern of usage. See *Henson*, 582 U. S., at ___ (slip op., at 5).[2]

The refineries suggest we need to place still another point in their column. They direct our attention to a regulation EPA adopted in 2014 to clarify the bounds of "small refinery" status. When EPA first sought public comment, some suggested a refinery should be eligible for exemption only if it *constantly* remained "small" from 2006 onward—and EPA expressly rejected that view in favor of revisiting annually whether a refinery falls above or below the "small refinery" threshold. 40 CFR §80.1441(e)(2)(iii). Before the Tenth Circuit, the Agency insisted this regulation sheds light on the meaning of "extension" and underscores that it does not include a continuity requirement. Indeed, EPA asked the court of appeals to defer to its understanding under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984). Although the refineries repeat that ask here, the government does not. With the recent change in administrations, "the government is not

_____

[2] Replying to our example, the dissent posits that subparagraph (A)(i)'s exemption "existed in the year 2010 by virtue of statute—even if a particular refinery was not in a position to take advantage of it." *Post*, at 12. But it's hard to see how a refinery might have an "exemption[] currently in place" when it does not qualify for or receive its benefits. *Post*, at 1. Even putting that problem aside, following the dissent's logic does not aid its cause. What is true for subparagraph (A)(i) should likewise be true for subparagraph (B)(i), which refers to "the exemption under subparagraph (A)." So, following the dissent's reasoning, one might just as easily conceive of a subparagraph (B)(i) exemption as "existing" even in a year when a small refinery "was not in a position to take advantage of it." Accordingly, on the dissent's logic, if a small refinery lacked the exemption in one year (say, 2016) and then applied for it in a later year (say, 2017), it would seem the exemption always "presently exist[ed]" and can be "extended." *Post*, at 4, 8.

invoking *Chevron*." Brief for Federal Respondent 46–47. We therefore decline to consider whether any deference might be due its regulation.

Against the petitioners' evidence of statutory meaning, the respondents ask us to consider one of their own. They point to the fact that subparagraph (A) is titled "temporary exemption," that it was permitted to expire in 2013, and that subparagraph (B)(i) speaks of extending "the exemption under subparagraph (A)." Together, respondents say, these statutory features suggest that the whole scheme of exemptions was meant to end rapidly, that subparagraph (B)(i) was designed as a narrow exception to a 2013 sunset rule, and that any further exemptions it allows should therefore be construed narrowly to end as quickly as possible.

But this much we do not see. In the first place, we do not construe subparagraph (B) as part of some sunset scheme. To be sure, subparagraph (A)'s exemptions were permitted to expire in 2013, but did not have to do so. In theory, EPA could have granted a small refinery exemption under subparagraph (A)(ii) that lasted many years or indefinitely. See 42 U. S. C. 7545(*o*)(9)(A)(ii)(II). In any case, subparagraph (B)(i) expressly contemplates exemptions beyond 2013—"at any time" hardship conditions are satisfied. If Congress really had wanted all exemptions to cease after a temporary period, that was surely an odd way to achieve it. Odder still in light of the fact that Congress had before it (but eschewed) many readymade models for a sunset statute if that's what it wished here. See, *e.g.*, §247d–7f(b) (providing that statutory provisions authorizing a "limited antitrust exemption" "shall expire at the end of [a] 17-year period" after the Act was passed). And maybe odder yet given that subparagraph (B)(i) exemptions are hardly destined to sunset quickly even on the respondents' account, for they do not dispute that small refineries with an unbroken record of failing to comply with the RFP may continue

to seek and obtain extensions forever. See Brief for Federal Respondent 43, n. 7; Brief for Industry Respondents 39.

Additionally, even assuming (without granting) that subparagraph (B) really did represent only some sort of exception to a general 2013 deadline, we still don't see how that would help. The respondents urge us to construe statutory exceptions narrowly. But this Court has made clear that statutory exceptions are to be read fairly, not narrowly, for they "are no less part of Congress's work than its rules and standards—and all are worthy of a court's respect." *BP p.l.c.* v. *Mayor and City Council of Baltimore, ante,* at 6. And fairly read, the key phrase at issue before us—"A small refinery may at any time petition the Administrator for an extension of the exemption under subparagraph (A) for the reason of disproportionate economic hardship"—simply does not contain the continuity requirement the court of appeals supposed. Instead, more naturally, it means exactly what it says: A small refinery can apply for (if not always receive) a hardship extension "at any time."[3]

## III

Everything else the respondents offer in defense of the

---

[3] Rather than argue subparagraph (B)(i) is an exception that should be construed narrowly, the dissent imagines some weakness in our position when we observe above that the word extension "can" or "may" be used to refer to an increase in time after a lapse. *Supra,* at 6. From this, the dissent supposes that we mean to say "HollyFrontier wins because its reading is [merely] *possible.*" *Post,* at 3. That is mistaken. As we have sought to explain, we simply recognize that the term "extension" may or may not convey a continuity requirement depending on context—much as the dissent acknowledges the term can sometimes tolerate a lapse of some sort. See *supra,* at 10, n. 2 (discussing subparagraph (A)(1)). Our holding today, too, should be clear. Rather than rule for HollyFrontier because it has advanced a permissible reading, and rather than offer assertions about "common sense" or what seems "more natural" to us, *post,* at 3–5, we have sought to explain why this particular statute's usage, context, and structure persuade us that continuity is not required here.

court of appeals' judgment involves surmise about legislative purpose and arguments from public policy. Like the Tenth Circuit, they emphasize that, by the time the petitioners sought new exemptions in 2017 and 2018, small refineries already "had many years to ponder . . . whether it made sense to enter into or remain in the market." 948 F. 3d, at 1247. The respondents argue that subparagraph (B) was adopted for the purpose of "funnel[ing] small refineries toward compliance over time." *Id.*, at 1246. And they submit that enforcing a continuity requirement helps advance congressional goals such as increasing "biofuel production, energy independence, and environmental protection." *Ibid.*

The dissent seemingly agrees. It acknowledges that Congress provided *other* ameliorating provisions to address various challenges to the fuel market. *Post*, at 8–10. For example and as we have already seen, §7545(*o*)(7)(A) grants EPA authority to waive RFP obligations at any time across an entire State or region to address severe hardships or shortages. Section 7545(*o*)(7)(E)(ii) provides a more limited waiver with respect to biomass-based diesel fuels. And §7545(*o*)(8)(D)(i) provided a waiver authority to address hardships for consumers "in calendar year 2006." But on the dissent's view, everything else in the statute aims to "[f]unnel[] refineries toward compliance." *Post*, at 9. Indeed, the dissent finds it "odd" that our reading would permit hardship relief only to small refineries in existence in 2008 and not to new ones, *post*, at 13—and that our reading "will require EPA to examine the 2008 study" when reviewing extension applications "decades from now," *post*, at 9.

But, as usual, the other side presents a plausible competing narrative. On the petitioners' account, the statute seeks to increase production of renewable fuel while also offering a "safety valve" each year for small refineries that might otherwise face extinction. According to the small refineries, the respondents' competing "funnel" metaphor makes little

sense because a small refinery's compliance in one year is
in no way dispositive of its ability to comply in a future year.
Instead, compliance depends on numerous factors unique to
each year and circumstances over which small refineries of-
ten have no control. Brief for Petitioners 42–44. In partic-
ular, most small refineries cannot comply with RFP man-
dates but must purchase credits from those that can. Each
year more credits are required. And the price for those
credits reflect the famously volatile nature of the fuel mar-
ket—in one recent year, prices shot up by as much as 100%.
See *id.*, at 45. Aware of these market realities, the small
refineries say, a rational Congress could have created (and
did create) a means for small refineries to seek a hardship
exemption "at any time" rather than be forced to exit the
market.

The petitioners say their "safety valve" analogy fits better
for other reasons too. As the dissent acknowledges, Con-
gress included many other "safety valve" provisions to ad-
dress various challenges to the market that may arise at
any time, including regional shortages and economic hard-
ships. *Post*, at 8–10. Surely, Congress could have chosen
to provide similar relief targeted to small refineries. Nor is
there anything odd about the fact that Congress chose only
to protect existing small refineries rather than new en-
trants. Often Congress chooses to protect existing market
participants from shifts in the law while applying new re-
strictions fully to future entrants. Maybe, too, the petition-
ers suggest, Congress wasn't particularly concerned with
new entrants in 2008 because, until last year, there had not
been a new refinery of any size in this country for almost 50
years. See Blackmon, First Major U. S. Oil Refinery Since
1977 Targets Bakken Shale Crude, Forbes (July 25, 2020),
https://www.forbes.com/sites/davidblackmon/2020/07/25/
first-new-us-oil-refinery-since-1977-targets-bakken-shale-
crude/.

The petitioners stress as well that, even on the respondents' account, Congress did create a "safety valve" rather than a "funnel" for *some* small refineries: Those with an unbroken record of failing to comply with the RFP may continue to seek and obtain extensions forever without being "funneled" toward compliance. *Supra*, at 11–12. Yet the respondents never explain why the least compliant refineries should be the most favored in this way. Nor do they confront the fact that their rule would have the strange effect of disincentivizing small refineries from ever trying to comply. Brief for Petitioners 22; Brief for State of Wyoming et al. as *Amici Curiae* 13–14. And even on the respondents' account, EPA will have to consult its 2008 study in future years for these permanently noncompliant refineries.

Beyond that, the petitioners note, if subparagraph (B)(i) really did create a "miss one and done" rule for small refineries able to comply with RFP mandates in a single year the statute could wind up reducing overall domestic fuel supply—all without adding a single additional gallon of renewable fuel to the mix. See 42 U. S. C. §7545(*o*)(5)(B); 40 CFR §80.1427. Permanently shuttering existing small refineries in the process could, as well, increase the Nation's future reliance on imported fuels. Brief for Petitioners 41. All of which sits uneasily with even the respondents' account of the statute's purposes.

We mention all this not because we pick sides. Neither the statute's text, structure, nor history afford us sufficient guidance to be able to choose with confidence between the parties' competing narratives and metaphors. We mention this only to observe that *both* sides can offer plausible accounts of legislative purpose and sound public policy—and that it would therefore be a mistake to rely on appeals to some abstract intuition that the number of small refineries receiving exemptions "*should have* tapered down" over time. 948 F. 3d, at 1246 (emphasis added). Instead, our analysis can be guided only by the statute's text—and that

nowhere commands a continuity requirement.

\*

The respondents have not shown that EPA's approval of the petitioners' extension requests was in excess of the Agency's statutory authority. 5 U. S. C. §706(2)(C). To the extent the court of appeals vacated EPA's orders on this ground, the judgment is

*Reversed.*

# SUPREME COURT OF THE UNITED STATES

No. 20–472

HOLLYFRONTIER CHEYENNE REFINING, LLC,
ET AL., PETITIONERS *v.* RENEWABLE
FUELS ASSOCIATION, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[June 25, 2021]

JUSTICE BARRETT, with whom JUSTICE SOTOMAYOR and JUSTICE KAGAN join, dissenting.

When Congress amended the Clean Air Act to add the Renewable Fuel Program (RFP), it gave small refineries a temporary exemption from compliance. Congress then vested the Environmental Protection Agency (EPA) with authority to grant "extension[s] of the exemption" in certain instances. The question in this case is straightforward: Does this provision limit EPA to prolonging exemptions currently in place, or does it enable EPA to provide exemptions to refineries that lack them? The statute's text and structure direct a clear answer: EPA cannot "extend" an exemption that a refinery no longer has. Because the Court's contrary conclusion caters to an outlier meaning of "extend" and clashes with statutory structure, I respectfully dissent.

## I

Refineries regulated by the RFP come in all shapes and sizes—ranging from those run by Fortune-500 companies like HollyFrontier to local outfits with less fuel-blending capacity and access to capital. So, as the Court notes, Congress made certain accommodations for small refineries that might otherwise struggle to satisfy their RFP obligations.

To start, Congress in subparagraph (A)(i) gave all small refineries—including petitioners (HollyFrontier)—a "[t]emporary exemption" from the program's renewable-fuel requirements; the exemption ran from the RFP's passage in 2005 until 2011. 42 U. S. C. §7545(*o*)(9)(A)(i). Then, in subparagraph (A)(ii), Congress directed the Department of Energy to conduct a study—to be completed no later than the end of 2008—to determine whether compliance with the RFP "would impose a disproportionate economic hardship on small refineries." §7545(*o*)(9)(A)(ii)(I). If so, the statute provides, EPA "shall extend the exemption" initially enjoyed by all small refineries "for a period of not less than 2 additional years." §7545(*o*)(9)(A)(ii)(II).

Congress also provided small refineries an avenue to petition for an "extension" of these initial exemptions. This is the provision at the heart of this case:

> "A small refinery may at any time petition [EPA] for an extension of the exemption under subparagraph (A) for the reason of disproportionate economic hardship." §7545(*o*)(9)(B)(i).

Deciding that this subparagraph uses "extension" to mean "continuation" should be an easy call. Following HollyFrontier's lead, however, the Court forgoes the obvious answer.

## A

HollyFrontier lays its cards on the table. It does not dispute that when used to refer to "an increase in the length of time," the word "extension" can—and commonly does— refer to something that is prolonged without interruption. Brief for Petitioners 29. Yet, HollyFrontier insists, the term "extension" is not *always* used that way. Instead, it might *sometimes* refer to a "non-continuous extension"—in other words, an extension of something that used to exist but no longer does. *Ibid.* Because there is "nothing unnatural" about reading the term this way, HollyFrontier urges us to

embrace this interpretation. *Id.*, at 31.

One might think that this argument is an uphill climb—after all, we do not usually pin an interpretation to "the outer limits of a word's definitional possibilities" at the expense of its ordinary or common meaning.[1] *FCC* v. *AT&T Inc.*, 562 U. S. 397, 407 (2011) (alterations omitted). But the Court takes HollyFrontier's framing and runs with it. The Court points out that the word "extension" "can" or "may" be used to refer to post-lapse renewals. *Ante*, at 6. And because the statute thus "commands" no "continuity requirement," *ante*, at 16, the Court concludes that Holly-Frontier's reading must be right—which means that EPA can provide an "extension" of an exemption that is no longer in effect.

Boiled down, the Court's position is that HollyFrontier wins because its reading is *possible*. But I would ask, as we typically do, how the term "extension" "is *most naturally* read." *Florida Dept. of Revenue* v. *Piccadilly Cafeterias, Inc.*, 554 U. S. 33, 39 (2008) (emphasis added); see also *Romag Fasteners, Inc.* v. *Fossil Group, Inc.*, 590 U. S. \_\_\_, \_\_\_ (2020) (slip op., at 4). The Tenth Circuit's answer to that question is spot on: The "ordinary definitions of 'extension,' along with common sense, dictate that the subject of an extension must be in existence before it can be extended." *Renewable Fuels Assn.* v. *EPA*, 948 F. 3d 1206, 1245 (2020).

1

In assessing the best reading of the phrase "extension of the exemption," the Court is of course correct that context matters. Here, though, context cuts respondents' way. Subparagraph (B)(i) does not use "extension" in a vacuum;

---

[1] To be sure, in some contexts we have asked whether a term can "permissib[ly]" bear an asserted meaning. *E.g.*, *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843 (1984). The Court avoids express reliance on that argument here.

rather, it permits EPA to grant an "extension *of the exemp-
tion under subparagraph (A)*." §7545(*o*)(9)(B)(i) (emphasis
added). What is being "extended," then, is "the exemption
under subparagraph (A)"—a discrete, time-limited period of
permissible noncompliance with the RFP. And when used
in this context, the noun "extension" means an "addition
that increases the . . . operation . . . of something," "a
stretching out or stretching forth: a carrying forward," or "a
part that is added to something to enlarge or prolong it; a
continuation."[2] The verb "extend" is similarly defined: It
means "[t]o cause (something) to be or last longer," to
"lengthen, elongate, prolong, protract," or "[t]o prolong in
duration."[3]

The Court acknowledges these definitions, yet still par-
rots HollyFrontier's point that no definition of "extend" *re-
quires* "unbroken continuity." *Ante*, at 6. But without
something that presently exists, there is nothing to "carr[y]
forward" or "prolong." The word "extension," then, plainly
contemplates a "continuation of the same" thing as cur-
rently exists—in contrast to the term "renewal," for exam-
ple, which refers to a "restoring" or "reestablishing" of some-
thing that used to exist. Compare Black's Law Dictionary
622 (8th ed. 2004), with *id.*, at 1322. Or, to put it slightly
differently, the word "extension" "'[i]mports the continu-
ance of an existing thing.'" Brief for Federal Respondent 21
(quoting W. Anderson, A Dictionary of Law 437 (1996)).

Common usage confirms as much. Consider a hotel guest
who decides to spend a few more days on vacation. That
guest likely would ask to "extend [her] visit." Random
House Webster's Unabridged Dictionary 684 (2d ed. 2001)

---

[2] American Heritage Dictionary 628 (4th ed. 2000); Webster's Third
New International Dictionary 804 (2002); New Oxford American Diction-
ary 596 (2d ed. 2005).

[3] American Heritage Dictionary, at 628; Webster's Third New Interna-
tional Dictionary, at 804 (capitalization deleted); 5 Oxford English Dic-
tionary 594 (2d ed. 1989).

(emphasis deleted). Now suppose the same guest returns to the same hotel three years later and, upon arrival, requests to "extend" her prior stay. The hotel employee would no doubt "scratch her head." Tr. of Oral Arg. 26. Why? Because it is highly unnatural to speak of "extending" a stay that ended years before.

Similar examples spring readily to mind. One would not normally ask to "extend" a newspaper subscription long after it expired. Or request, after child number two, to "extend" the parental-leave period completed after child number one. Or report that an athlete signed a contract "extension" with her first team after spending several seasons with a rival squad. These examples do not derive their force by superimposing a "continuity requirement" on the word "extend." Cf. *ante*, at 6, 8, 9, 10, 12, 13, 16. Instead, continuity is inherent in the way that people usually use the word "extension"—namely, to reference something currently "in existence" such that there is a "continuing connection with the thing to be extended." Brief for Federal Respondent 21. That is so, moreover, absent any additional "modifying language" requiring the "extension" to be "'consecutive'" or "'successive.'" *Ante*, at 8.

By dismissing the need for a continuing connection between the first period and the second, the Court forgoes the "far more natural" reading of extend. *Taniguchi* v. *Kan Pacific Saipan, Ltd.*, 566 U. S. 560, 569 (2012). The upshot? A refinery could ask to "extend" an exemption it had in 2010 in the year 2040, with no need to connect the two periods. It defies ordinary usage to deem the second exemption "an extension" of the first, as opposed to a new, standalone exemption. HollyFrontier recognizes as much, seeking to deflect this example as "extreme" and "highly unlikely." Tr. of Oral Arg. 28. Unlikely or not, it follows logically from HollyFrontier's reading of "extension"—which shows just how far this interpretation strays from the term's ordinary meaning.

2

The Court's counterexamples do not help its case. Take its discussion of deadline "extensions"—as given, say, to a student who seeks more time to complete a paper even after the due date has passed or to a party who requests leave to file a document after the court's original deadline. See *ante*, at 6–8. In this context, "extension" refers to "an additional period of time given one to meet an obligation." Random House Webster's Unabridged Dictionary, at 684; see also American Heritage Dictionary, at 628 ("[a]n allowance of extra time, as for the repayment of a debt"); Black's Law Dictionary, at 622 ("[a] period of additional time to take an action, make a decision, accept an offer, or complete a task"). Because there is nothing odd about granting an extension even after the deadline has lapsed, the Court insists that there is nothing odd about granting HollyFrontier an exemption "extension" even after its initial exemption period has expired.

Put aside for the moment that this case does not involve the extension of a deadline. The Court's reasoning still breaks down because when a deadline "extension" is granted, there is no "lapse": The new deadline runs back to the old. In other words, a post-due-date extension does not start a *new* period for timely action. It forgives the missed deadline by retroactively prolonging the pre-existing period. Even in the Court's deadline-extension examples, then, there is continuity.[4]

---

[4]The hypothetical that the Court offers to refute this critique—a teacher authorizing a student who missed a Friday deadline to turn in a paper between 8 a.m. and 9 a.m. on Monday—gets it nowhere. It is either an extension of the deadline to 9 a.m. on Monday, in which case it operates like the other deadline extensions I have described, with the teacher simply specifying when she will be present to receive the paper. Or it is an example of something other than a deadline extension—like the start of an entirely new window for timely conduct—in which case it is inapposite.

Problems likewise plague the Court's other hypotheticals involving delay in "seek[ing] an 'extension,'" such as the tenant who asks to "extend" her lease after overstaying it or parties who negotiate to "extend" a contract after it expires. *Ante*, at 6. These examples confuse the time at which one may permissibly *request* an extension with *what* is being extended. It may be that the tenant could request an "extension" of the year-one lease at some point after the start of year two. But, if approved, the tenant's lease would still be continuous—running from year one to year two—and the tenant would no doubt owe rent for the intervening period. By contrast, the Court's reading of "extend" would capture a tenant who moves out in year one and returns in year five. In that scenario, no one would say that the tenant sought an "extension" of her lease—nor would anyone expect the tenant to pay back-rent for the intervening years.

The Court next reaches for recent congressional enactments—or more specifically, for their captions. The title of two COVID–19 relief provisions, the Court notes, purported to provide an "extension" of certain unemployment benefits that had previously lapsed. See *ante*, at 7 (quoting Pub. L. 116–260, §203, 134 Stat. 1182; Pub. L. 116–136, §2114, 134 Stat. 281). I will start with the obvious: Invoking captions from "different statute[s] altogether," passed in an emergency context over a decade after the RFP, "does not have much force." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 172 (2012). The argument is made weaker still by the fact that Congress used "extension" the other way in the RFP statute itself. See *infra*, at 8. And it is telling that apart from the COVID–19 relief provisions, HollyFrontier could identify no other instance in which Congress used "extension" in the way that Holly-Frontier proposes.

At the very most, the Court's COVID–19 examples show that "extend" does not "*always* includ[e] a strict continuity requirement." *Ante*, at 8 (emphasis added). But "[t]hat a

definition is broad enough to encompass one sense of a word does not establish that the word is *ordinarily* understood in that sense." *Taniguchi*, 566 U. S., at 568. Because respondents' interpretation of "extension" is "far more natural," *id.*, at 569, it is the presumptive favorite—barring compelling evidence to the contrary in the statute's structure. As it turns out, statutory structure favors respondents' reading too.

## B
### 1

Four structural features of the RFP, in particular, cut for respondents' interpretation and against the Court's.

*First*, respondents' reading of "extension" tracks the only other use of the term in the RFP. A nearby "[w]aiver" provision allows EPA to issue an "order to reduce, for up to a 60-day period," the biomass-based diesel fuel requirements under certain conditions. §7545(*o*)(7)(E)(ii). In a related provision entitled "[e]xtensions," Congress authorized EPA to reduce those requirements "for up to an additional 60-day period" based on an assessment that the conditions are "continuing beyond" the original "60-day period." §7545(*o*)(7)(E)(iii). This provision, like respondents' interpretation, uses "extension" to reference a continuation of something that presently exists. Cf. *ante*, at 5 (noting that "absent contrary evidence, this Court normally presumes consistent usage").

*Second*, the RFP is replete with express grants of waiver authority of the type the Court reads into subparagraph (B)(i)'s reference to "extension[s]." The statute's "general" waiver provision specifies that EPA, under certain economic or fuel-market conditions, "may waive the requirements" of the RFP "in whole or in part on petition by" refineries, among other entities. §7545(*o*)(7)(A). As discussed, EPA also has express standalone waiver authority with respect to biomass-based diesel levels. See §7545(*o*)(7)(E)(ii)

(EPA can "issue an order to reduce, for up to a 60-day period, the quantity of biomass-based diesel required . . . "). Elsewhere, the statute authorizes EPA to "waive, in whole or in part, the renewable fuel requirement[s]" following a finding that compliance would have a significant adverse impact on consumers at the outset of the program. §7545(*o*)(8)(D)(i).

Together, these nearby RFP provisions show that Congress had an "easy way" to delegate standalone waiver authority when it wished. *Advocate Health Care Network* v. *Stapleton*, 581 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 8). Yet Congress "did not adopt that ready alternative" in subparagraph (B)(i)—it instead used "language whose most natural reading" does *not* contemplate freestanding waiver authority. *Ibid.* See also *ante*, at 8 (looking to "the absence of any parallel . . . language" as an interpretive "clue").

*Third*, note that when assessing petitions for an "extension of the exemption," EPA must consider "the findings of the study under subparagraph (A)(ii)"—*i.e.*, the Department of Energy study to be completed by 2008. See §§7545(*o*)(9)(B)(i)–(ii). The Court's reading will require EPA to examine the 2008 study when evaluating "extension" petitions filed decades from now—say, in 2050—even though the refinery may have had long stretches of compliance in the interim. If Congress intended exemption "extension[s]"—or waivers, as the Court treats them—to remain available for decades, why would it instruct EPA to keep evaluating them in light of a 2008 study? Respondents' reading makes more sense of this instruction because it embraces the possibility, even the likelihood, that exemptions would not be available forever. Funneling refineries toward compliance means that it would be surprising rather than expected for EPA to be considering a 2008 study in 2050.

*Fourth*, other provisions help ease the burden on small refineries in times of economic hardship. To ensure that

EPA can appropriately adjust the RFP requirements it sets, the statute requires EPA to review "the feasibility of achieving compliance" and "impacts of" the RFP on regulated refineries. §§7545(*o*)(11)(B)–(C). And if compliance is not feasible in a given year, the RFP allows individual refineries to carry a compliance deficit into the next year. See *ante*, at 2 (discussing §7545(*o*)(5)(D)). Recall too that in cases where compliance would work severe economic harm on a State or a region, the general-waiver provision allows EPA to waive the requirements in whole or in part. §7545(*o*)(7)(A)(i). Economic concerns are at the center of other RFP waiver provisions as well. See §7545(*o*)(7)(E)(ii) (waiver based on price of biomass-based diesel fuel); §§7545(*o*)(8)(A)–(D) (waiver based on "significant adverse impacts on consumers," including impacts on "supplies and prices"). Congress' direct concern with economic difficulties in separate provisions further undermines HollyFrontier's argument that Congress must have meant to vindicate such concerns by granting EPA broad waiver power in subparagraph (B)(i).

2

The Court's structural counters are not persuasive.

*First*, the Court cites the statute's instruction that a small refinery can file a subparagraph (B)(i) petition "'at any time.'" See *ante,* at 9 (quoting §7545(*o*)(9)(B)(i)). This argument falls apart on close inspection. "[A]t any time" informs *when* a refinery may file an "extension" request; it cannot change the type of request that EPA can grant. By using the phrase "at any time," the statute gives a small refinery with an exemption flexibility about when to file a request to extend that exemption for the following year.

This reading does not leave "at any time" without important work to do. For one, the phrase means that refineries need not seek exemptions before EPA's fuel standards are due—which is November 30 in the calendar year before

the refinery must apply. §7545(*o*)(3)(B). This is a "significant statutory concession." 948 F. 3d, at 1248. It allows (but does not require) regulated refineries to see what their obligations will be before deciding whether to seek an exemption; it also means that EPA may not always be able to "'compensate for the renewable-fuel shortfall created by belated exemptions.'" *Ibid.* (quoting *American Fuel & Petrochemical Mfrs.* v. *EPA*, 937 F. 3d 559, 571 (CADC 2019)).

In addition, the phrase helps account for the delayed-request scenarios the Court posits. See *ante*, at 7. To see why, suppose that a refinery with an exemption in 2014 planned to ramp up its operations in 2015 and anticipated that it would no longer need or qualify for exempt status. Then imagine that, halfway through 2015, the refinery concluded that it would in fact need an exemption for that year. The "at any time" provision allows it to file for one, thereby giving refineries the ability to adjust in the face of "market fluctuations and changing hardship conditions." *Ante*, at 9. Unlike the Court's interpretation, this account of "at any time" respects the ordinary meaning of "extension" by requiring the "exemptions" themselves to run continuously—in the above example, from 2014 to 2015.

*Second*, the Court leans on the fact that "subparagraph (A) uses the term 'extension' *without* a continuity requirement." *Ibid.* That must be so, according to the Court, because a refinery could fall out of small-refinery status, say, in 2010, yet still receive an "extension of the exemption" for 2011 under subparagraph (A)(ii).

It is hard to know quite what to make of the Court's theory. It never played out in practice, as EPA regulations meant that no small refinery lost exempt status during the years in question. See 72 Fed. Reg. 23925 (2007); 75 Fed. Reg. 14866 (2010); see also Tr. of Oral Arg. 66–67. And the theory was neither passed on by the court below nor discussed by respondents here, as it appeared for the first time in a footnote of HollyFrontier's reply brief. Reply Brief 10,

n. 6. But in any event, the Court's account does not seem to prove that subparagraph (A) permits a "laps[e]." *Ante*, at 10. What EPA may "extend" via subparagraph (A)(ii) is "the exemption under clause (i)"—that is, the initial, automatic exemption that excused all small refineries from compliance through 2010. The "exemption under clause (i)" thus existed in the year 2010 by virtue of statute, even if a particular refinery was not in a position to take advantage of it. "Extending" that exemption into 2011—should the refinery once again qualify for small-refinery status—would thus appear to be consistent with respondents' reading of the term. Regardless, any ambiguity about the functioning of subparagraph (A) cannot save an argument that is otherwise overwhelmed by the term's ordinary meaning and other aspects of the RFP's structure.

## II

The Court declines to "pick sides" in the parties' dispute over which reading of subparagraph (B)(i) best fulfills congressional purpose. *Ante*, at 15. At the same time, the Court criticizes respondents' reading for causing the "strange effect" of treating the least compliant refineries most favorably. *Ibid.* In the Court's telling, extensions that function as waivers (its view) give refineries that comply in some years a boost when they need help. Extensions that prolong a grace period (respondents' view) reward refineries that never manage to comply.

But respondents' argument that subparagraph (B)(i) extensions give small refineries an initial runway—rather than a down-the-road safety valve—is not at all odd if, as respondents assert, Congress intended the RFP to funnel all refineries into eventual compliance.[5] Maybe respondents' story about the statute's purpose is right; maybe it is

─────────

[5] This funneling effect started to play out. Although about half of all small refineries initially received study- or petition-based extensions,

wrong. In all events, though, it is not "strange"—in fact, the Court deems this account just as "plausible" as any. *Ante*, at 15.

Plus, the Court's reading of subparagraph (B)(i) yields its own odd results: It means that EPA's exemption power covers only those refineries in existence at the RFP's outset. This makes little sense if one accepts HollyFrontier's account of the provision's "safety valve" purpose. *Ibid.* (internal quotation marks omitted). If Congress' point was to give leeway to refineries subject to unpredictable market fluctuations and ever-increasing compliance burdens, then it is hard to see why the provision would distinguish between old and new refineries facing "the same current economic outlook" in a given year. Brief for Federal Respondent 43, n. 7.

In the end, the parties' dueling accounts of purpose underscore the wisdom of sticking to the statutory text and structure. Because, in my view, both clearly favor respondents' reading, I respectfully dissent.

---

fewer refineries sought and received such extensions as time went on. By 2014, most small refineries, including petitioners, were meeting their renewable-fuel obligations. The number of exempt refineries later spiked—with EPA granting 35 petitions for compliance year 2017, and 31 for 2018—when EPA came to a new view of how to administer subparagraph (B)(i).