*PRELIMINARY PRINT*

VOLUME 605 U. S. PART 2

PAGES 627–664

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

JUNE 18, 2025

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published.   Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

## ENVIRONMENTAL PROTECTION AGENCY *v.* CALU-MET SHREVEPORT REFINING, L.L.C., ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 23–1229.   Argued March 25, 2025—Decided June 18, 2025

The Clean Air Act (CAA) establishes a comprehensive venue framework for judicial review of Environmental Protection Agency (EPA) actions designed to ensure proper distribution of cases among federal courts. Under 42 U. S. C. §7607(b)(1), "nationally applicable" EPA actions must be challenged exclusively in the D. C. Circuit, while "locally or regionally applicable" actions ordinarily belong in regional Circuits. However, locally or regionally applicable actions that are "based on a determination of nationwide scope or effect" must be reviewed in the D. C. Circuit if EPA finds and publishes that such basis exists. This tripartite system reflects congressional intent to channel nationally significant EPA actions to the D. C. Circuit while keeping most regionally focused matters in local Circuits.

Under the CAA's renewable fuel program, most domestic refineries must blend specified amounts of ethanol and other renewable fuels into transportation fuels they produce. The Act provides a phased exemption scheme for small refineries—those processing no more than 75,000 barrels of crude oil daily—allowing them to petition EPA for exemptions based on "disproportionate economic hardship." §7545(*o*)(9)(B)(i). Following this Court's decision in *HollyFrontier Cheyenne Refining, LLC* v. *Renewable Fuels Assn.*, 594 U. S. 382, which clarified that small refineries could obtain exemption "extensions" even after their original exemptions had lapsed, the D. C. Circuit remanded pending exemption cases to EPA for reconsideration.

EPA then proposed and ultimately denied 105 small refinery exemption petitions in two omnibus notices issued in April and July 2022. EPA's denials were based on two principal determinations: first, its interpretation that "disproportionate economic hardship" covers only hardship directly caused by renewable fuel program compliance; and second, its economic theory that Renewable Identification Number (RIN) costs are fully passed through to consumers, creating a presumption against granting exemptions. EPA applied these determinations uniformly while conducting confirmatory reviews of individual refinery circumstances. EPA asserted in its denial notices that the denials were reviewable only in the D. C. Circuit, either as "nationally applicable"

Syllabus

actions or, alternatively, as locally applicable actions "based on a determination of nationwide scope or effect."

Small refineries challenged these denials in multiple regional Circuits. Most Circuits either dismissed the challenges for improper venue or transferred them to the D. C. Circuit. However, the Fifth Circuit retained jurisdiction, rejecting EPA's venue arguments and ruling for the refineries on the merits. The Fifth Circuit reasoned that EPA's actions were merely locally applicable because their "*legal* effect" was limited to the petitioning refineries, and that the actions were not based on determinations of nationwide scope or effect because EPA still examined refinery-specific facts before issuing denials.

*Held*: EPA's denials of small refinery exemption petitions are locally or regionally applicable actions that fall within the "nationwide scope or effect" exception, requiring venue in the D. C. Circuit. Pp. 636–650.

(a) Section 7607(b)(1) creates a two-step inquiry for determining venue. First, courts assess whether an EPA action is nationally applicable or only locally or regionally applicable. If nationally applicable, the case belongs in the D. C. Circuit. If locally or regionally applicable, courts proceed to the second step to determine whether the "nationwide scope or effect" exception applies to override the default rule of regional Circuit review. Pp. 636–642.

(1) To identify the relevant "action," courts must look to the authorizing CAA provision rather than how EPA packages its decisions. The enumerated "actions" in § 7607(b)(1) make clear that this provision "treats each activity the Clean Air Act allows the EPA to take as a distinct 'action.'" *Kentucky* v. *EPA*, 123 F. 4th 447, 460. Because the CAA allows "[a] small refinery" to "petition [EPA] for an extension of [its] exemption" and requires EPA to "act on any petition submitted," each EPA denial of a refinery's exemption petition constitutes its own "action" for venue purposes. Pp. 636–638.

(2) An action is "nationally applicable" if it applies "[o]n its face" throughout the entire country, or only "locally or regionally applicable" if it applies only to particular localities or regions. *Sierra Club* v. *EPA*, 926 F. 3d 844, 849. EPA's denial of a single refinery's exemption petition applies only to that refinery, a particular entity in a particular place, making such denials paradigmatically "locally or regionally applicable" actions. Pp. 638–640.

(3) EPA's argument that it can control the unit of "action" for venue purposes by aggregating similar petitions into omnibus notices lacks any statutory limiting principle and would effectively give EPA veto power over venue. EPA's position that any action affecting more than one Circuit is nationally applicable would render actions with plainly local

or regional focus "nationally applicable" simply because the locality or region straddles Circuit lines.   Pp. 640–642.

(b) Because EPA's actions are locally or regionally applicable, the Court must determine whether the "nationwide scope or effect" exception applies.   This exception requires that (1) the action "is based on a determination of nationwide scope or effect," and (2) EPA "finds and publishes that such action is based on such a determination."   All agree the second requirement is satisfied.   Pp. 642–650.

(1) A "determination" refers to EPA's justifications in taking the action.   Determinations are of nationwide "scope" if they apply throughout the country "as a legal matter (de jure)" and of nationwide "effect" if they so apply "as a practical [matter] (de facto)."   *Kentucky*, 123 F. 4th, at 465.   An EPA action is "based on" a determination of nationwide scope or effect only if that determination "lie[s] at the core of the agency action" and forms the primary explanation for and driver of EPA's action.   *Texas* v. *EPA*, 829 F. 3d 405, 419.   This requires more than but-for causation; it requires that a justification of nationwide breadth be the most important part of EPA's reasoning.   Courts should evaluate this *de novo*.   Pp. 643–646.

(2) Applying this framework, EPA's exemption denials were based on determinations of nationwide scope or effect.   EPA's interpretation of "disproportionate economic hardship" under § 7545(*o*)(9)(B)(i) and its RIN passthrough theory are clear determinations of nationwide scope or effect that apply generically to all refineries regardless of geographic location.   These determinations formed the core basis for EPA's denials because EPA used them to reach a presumptive resolution to deny all petitions, then considered refinery-specific factors only to confirm it had no reason to depart from this presumptive disposition.   Where EPA relies on determinations of nationwide scope or effect to reach a presumptive resolution, those determinations qualify as the primary driver of its decision.   EPA's confirmatory review of refinery-specific facts is "[m]erely peripheral" by comparison.   *Texas*, 829 F. 3d, at 419.   Pp. 646–647.

(3) The Court rejects EPA's argument that "determination" covers only the resolution of unsettled issues, as well as respondents' argument that "determination" is a term of art applicable only when a CAA provision textually directs EPA to make a "determination" for the entire Nation.   The Court also rejects the argument that EPA's consideration of refinery-specific facts precludes the exception's application, noting that the exception requires an action be "based on," not "based solely on," a determination of nationwide scope or effect.   Pp. 647–650.

86 F. 4th 1121, vacated and remanded.

Syllabus

THOMAS, J., delivered the opinion of the Court, in which ALITO, SOTO-MAYOR, KAGAN, KAVANAUGH, BARRETT, and JACKSON, JJ., joined. GORSUCH, J., filed a dissenting opinion, in which ROBERTS, C. J., joined, *post*, p. 650.

*Deputy Solicitor General Stewart* argued the cause for petitioner. With him on the briefs were *Acting Solicitor General Harris, Solicitor General Prelogar, Assistant Attorney General Kim, Aimee W. Brown, Bryan J. Harrison, Susannah Weaver,* and *Matthew Marks.*

*Seth P. Waxman* argued the cause for respondents Growth Energy et al. in support of petitioner. With him on the briefs were *Matthew W. Morrison, Shelby L. Dyl,* and *David M. Lehn.*

*Michael R. Huston* argued the cause for respondent Calumet Shreveport Refining, L.L.C., et al. With him on the brief were *Karl J. Worsham, Jordan M. Buckwald, Sopen Shah, Alexandra M. Bromer, Jonathan G. Hardin, Aimee E. Ford,* and *Eric Wolff.*[*]

———

[*]Briefs of *amici curiae* urging reversal were filed for the State of New York et al. by *Letitia James,* Attorney General of New York, *Barbara D. Underwood,* Solicitor General, *Judith N. Vale,* Deputy Solicitor General, *Elizabeth A. Brody,* Assistant Solicitor General, and *Morgan A. Costello* and *Claiborne E. Walthall,* Assistant Attorneys General, by *Christian Menefee,* and by the Attorneys General for their respective jurisdictions as follows: *Kris Mayes* of Arizona, *Philip J. Weiser* of Colorado, *William Tong* of Connecticut, *Kathleen Jennings* of Delaware, *Brian L. Schwalb* of the District of Columbia, *Kwame Raoul* of Illinois, *Anthony G. Brown* of Maryland, *Andrea Joy Campbell* of Massachusetts, *Dana Nessel* of Michigan, *Keith Ellison* of Minnesota, *Matthew J. Platkin* of New Jersey, *Ellen F. Rosenblum* of Oregon, *Michelle A. Henry* of Pennsylvania, *Peter F. Neronha* of Rhode Island, *Charity R. Clark* of Vermont, *Robert W. Ferguson* of Washington, and *Joshua L. Kaul* of Wisconsin; and for NATSO et al. by *Hyland Hunt* and *Ruthanne M. Deutsch.*

Briefs of *amici curiae* urging affirmance were filed for Countrymark Refining and Logistics, LLC, by *Aaron M. Herzig* and *Philip D. Williamson*; and for Sen. Mike Lee et al. by *R. Trent McCotter.*

*Jeremy C. Marwell, Jennifer B. Dickey, Andrew R. Varcoe,* and *Eric Groten* filed a brief for the Chamber of Commerce of the United States of America as *amicus curiae.*

Justice Thomas delivered the opinion of the Court.

The Clean Air Act (CAA) establishes a tripartite system for determining venue in CAA litigation. Challenges to "nationally applicable" Environmental Protection Agency (EPA) actions belong in the U. S. Court of Appeals for the D. C. Circuit, while challenges to "locally or regionally applicable" EPA actions ordinarily belong in a regional Circuit. 42 U. S. C. § 7607(b)(1). But, the CAA makes an exception for local or regional actions that are "based on a determination of nationwide scope or effect" and accompanied by an EPA finding of this basis, which also must be challenged in the D. C. Circuit. *Ibid.* Applying this framework to EPA's 2022 denials of certain small refineries' exemption petitions, we hold that the refineries' challenges belong in the D. C. Circuit. EPA's denials are only locally or regionally applicable, but they fall within the "nationwide scope or effect" exception.

I

A

Section 7607(b)(1)—the CAA's venue provision—governs where petitioners should file challenges to EPA actions under that statute. As originally enacted, § 7607(b)(1) dictated venue only for an enumerated subset of EPA actions. Certain actions with a national reach, such as "any national primary or secondary ambient air quality standard" (NAAQS) were reviewable only in the D. C. Circuit. § 1857h–5(b)(1) (1970 ed.). Area-specific "implementation plan[s]" went to "the appropriate" regional Circuit. *Ibid.* Any other unmentioned actions could be heard only in district courts through their general grant of federal-question jurisdiction. *Harrison* v. *PPG Industries, Inc.*, 446 U. S. 578, 584 (1980); see 28 U. S. C. § 1331.

In 1977, Congress replaced this patchwork system with the CAA's current scheme, which makes all EPA actions directly reviewable in a federal court of appeals. 91 Stat. 776

(codified as amended at 42 U. S. C. §7607(b)(1)). The amended statute specifies that, in addition to NAAQS and other enumerated actions, "any other nationally applicable . . . final action taken" by EPA under the CAA may be reviewed only in the D. C. Circuit. §7607(b)(1). And, in addition to implementation plans, "any other final action of [EPA] under this chapter . . . which is locally or regionally applicable" ordinarily may be reviewed only in a regional Circuit. *Ibid.* Congress has since amended the CAA to specify additional kinds of actions that fall within these two categories. 91 Stat. 1404; 104 Stat. 2681.

Congress also created a third venue category in the 1977 amendments. This category provided an exception to the default rule that locally or regionally applicable actions should be reviewed in the regional Circuits. Congress instructed that a locally or regionally applicable action must be reviewed in the D. C. Circuit "if [it] is based on a determination of nationwide scope or effect" and "if in taking such action [EPA] finds and publishes that such action is based on such a determination." §7607(b)(1).

B

The EPA actions at issue in this case relate to the CAA's renewable fuel program (RFP). The RFP "requires most domestic refineries to blend a certain amount of ethanol and other renewable fuels into the transportation fuels they produce." *HollyFrontier Cheyenne Refining, LLC* v. *Renewable Fuels Assn.*, 594 U. S. 382, 385 (2021). Each covered refinery's precise obligation turns on its proportional share of various "nationwide volume mandates." *Id.*, at 385–386; see §§7545(*o*)(2)(A)(i), (*o*)(3); 40 CFR §80.1407(a) (2024).

Covered refineries demonstrate compliance through a system of Renewable Identification Number credits (RINs). See 40 CFR §§80.1425, 80.1426(a). A refinery generates RINs whenever it blends renewable fuels, §80.1426(a),

and refineries may also buy and sell RINs, 42 U. S. C. § 7545(*o*)(5)(B). Thus, each year, a refinery may show compliance "thanks to its own blending efforts, the purchase of credits from someone else, or a combination of both." *HollyFrontier*, 594 U. S., at 386.

The CAA contains a phased exemption scheme for small refineries—*i. e.*, refineries whose "average aggregate daily crude oil throughput for a calendar year . . . does not exceed 75,000 barrels." § 7545(*o*)(1)(K). The scheme exempted all small refineries from RFP compliance until 2011. § 7545(*o*)(9)(A)(i). It then required EPA to extend this blanket exemption, for at least two years, for all small refineries found by a Department of Energy study to face "disproportionate economic hardship" if subjected to the RFP's obligations. § 7545(*o*)(9)(A)(ii). Finally, the scheme allows a small refinery to "at any time petition [EPA] for an extension of [its] exemption . . . for the reason of disproportionate economic hardship." § 7545(*o*)(9)(B)(i). We interpreted this last provision in *HollyFrontier*, holding that a small refinery may obtain an "extension" even after its original exemption has lapsed. *Id.*, at 396.

C

This case arose in the aftermath of *HollyFrontier*. Pending that decision, the D. C. Circuit had been holding in abeyance challenges to EPA's resolution of 36 small refineries' exemption petitions for the 2018 compliance year. Afterwards, that court granted EPA's motion for remand without vacatur, so that EPA could reconsider its orders in light of the *HollyFrontier* litigation. Order in *Sinclair Wyoming Refining Co.* v. *EPA*, No. 19–1196 etc. (CADC, Dec. 8, 2021), p. 3. The D. C. Circuit instructed EPA to issue its new decisions within 120 days. *Ibid.*

Shortly thereafter, EPA noticed for public comment a proposal to deny all pending exemption petitions. 86 Fed. Reg. 71000 (2021). EPA's notice set out two principles. *First*, EPA offered its interpretation of "disproportionate economic

hardship," the CAA's threshold for an exemption petition to be granted. § 7545(*o*)(9)(B)(i). On EPA's view, that phrase covers only hardship that is caused by RFP compliance. App. in No. 22–60266 etc. (CA5), pp. 545–548. *Second*, EPA theorized that, as a matter of economics, small refineries ordinarily do not suffer disproportionate economic hardship as a result of the RFP because "RIN costs are fully passed through to consumers." *Id.*, at 549; see *id.*, at 548–584. Based on this "RIN passthrough" theory, EPA proposed denying all pending petitions "by finding the petitioning refineries do not face [disproportionate economic hardship] caused by compliance with their [RFP] obligations." 86 Fed. Reg. 71000.

After receiving comments, EPA followed through and denied the pending exemption petitions in two omnibus notices. EPA issued the first in April 2022 to deny the 36 petitions subject to the D. C. Circuit's deadline. 87 Fed. Reg. 24300. EPA issued the second in July 2022, to deny an additional 69 petitions from the 2016 to 2021 compliance years. *Id.*, at 34874. In both notices, EPA relied primarily on the principles from its proposal—namely, its statutory interpretation of "disproportionate economic hardship" and its RIN passthrough theory. App. to Pet. for Cert. 100a, 107a, 242a, 249a. EPA treated the passthrough theory as creating a presumption against granting exemptions, and it examined the petitioning refineries' evidence regarding their specific circumstances to confirm that none of the refineries had rebutted this presumption. See *id.*, at 107a–108a, 163a–168a, 249a–250a, 305a–310a.

EPA also asserted in the denial notices that its denials were reviewable only in the D. C. Circuit. According to EPA, the notices were "'nationally applicable'" actions under § 7607(b)(1). *Id.*, at 187a, 328a. Alternatively, if the actions were only "locally or regionally applicable," then EPA invoked the exception for actions "based on a determination of 'nationwide scope or effect.'" *Ibid.* EPA in-

cluded in both notices a finding that its new statutory interpretation and RIN passthrough theory supplied the relevant determinations of nationwide scope or effect. *Id.*, at 187a–188a, 329a.

Notwithstanding EPA's position, small refineries challenged these denials in a host of regional Circuits. Agreeing with EPA that the litigation belonged in the D. C. Circuit, most of these Circuits either dismissed the petitions for improper venue or transferred them to the D. C. Circuit.[1]

The Fifth Circuit took a different approach. Evaluating the petitions filed by six small refineries (respondents here), the Fifth Circuit held that the litigation was properly before it. The majority rejected the arguments for transfer raised by EPA and a group of intervenors, reasoning that EPA's notices were merely locally or regionally applicable actions, because their "*legal* effect" was limited to the petitioning refineries. 86 F. 4th 1121, 1131–1132 (2023). And, contra EPA, the notices were not based on any determination of nationwide scope or effect. Both EPA's new interpretation and its RIN passthrough theory "fail[ed] to provide the agency with a sufficient basis to adjudicate exemption petitions," because EPA still looked to refinery-specific facts before it issued its denials. *Id.*, at 1133. Accordingly, the case properly belonged in the Fifth Circuit, and the majority proceeded to rule against EPA on the merits, vacating and remanding EPA's denials for further consideration. *Id.*, at 1133, 1142.

Judge Higginbotham dissented on venue grounds. In his view, EPA's denial notices were nationally applicable because they applied throughout the country: EPA applied a consist-

---

[1] See, *e. g.*, Orders in *American Rfg. Group, Inc.* v. *EPA*, No. 22–1991 (CA3, Aug. 9, 2022), ECF Doc. 23; *Countrymark Rfg. & Logistics, LLC* v. *EPA*, No. 22–1878 (CA7, July 20, 2022), ECF Doc. 13; *Calumet Mont. Rfg., LLC* v. *EPA*, No. 22–70124 (CA9, Oct. 25, 2022), ECF Doc. 16; *Wyoming Rfg. Co.* v. *EPA*, No. 22–9538 (CA10, Aug. 23, 2022), ECF Doc. 26; see also *Hunt Rfg. Co.* v. *EPA*, 90 F. 4th 1107, 1113 (CA11 2024).

ent approach to small refineries spanning "eighteen different states, in the geographical boundaries of eight different circuit courts." *Id.*, at 1143–1144. And, if the notices were only locally or regionally applicable, then EPA was correct to find that the "nationwide scope or effect" exception applied: EPA's statutory interpretation and its passthrough theory were "core determinations" that have nationwide scope or effect in that they "are applicable to all small refineries no matter the location or market in which they operate." *Id.*, at 1145. We granted certiorari to clarify where venue properly lies.   604 U. S. 997 (2024).

## II

Section 7607(b)(1) creates a two-step inquiry for determining venue. At the first step, we assess whether an EPA action is nationally applicable, or only locally or regionally applicable. If the action is nationally applicable, then our inquiry ends: The case belongs in the D. C. Circuit. If the action is locally or regionally applicable, then we proceed to the second step. There, we ask whether the "nationwide scope or effect" exception applies to override the default rule that locally or regionally applicable actions belong in the regional Circuits. Turning to § 7607(b)(1)'s first step, we hold that the actions before us are only locally or regionally applicable.

## A

To properly categorize EPA's actions at the first step, we must determine what the relevant "action" is, and what it means for an action to be "nationally applicable" as opposed to "locally or regionally applicable." Once those principles are clarified, the categorization here is straightforward.

## 1

Because § 7607(b)(1) pegs venue to the scope of the EPA action being challenged, our threshold task is to identify the "action" at issue. To do so, we must read "action" in its

context. That word means "a thing done." Webster's
Third New International Dictionary 21 (1976) (Webster's);
see also Black's Law Dictionary 26 (5th ed. 1979) (Black's)
("something done"). But, we could define the "thing done"
by EPA in different ways. Both EPA's denials of each indi-
vidual exemption petition and its aggregation of those deni-
als into omnibus notices are in a sense things done. The
former is an "activity the Clean Air Act allows the EPA to
take," while the latter is how EPA has chosen to undertake
that activity. *Kentucky* v. *EPA*, 123 F. 4th 447, 460 (CA6
2024).

To determine which framing matters for purposes of
§ 7607(b)(1), we look to the example "actions" this provision
enumerates. Section 7607(b)(1) lists various examples of
EPA actions that qualify as either "nationally applicable" or
"locally or regionally applicable." For both these terms, it
then provides a catchall for "any other" "final action." And,
we "interpret a 'general or collective term' . . . in light of
any 'common attribute[s]' shared by" statutory examples of
that term. *Southwest Airlines Co.* v. *Saxon*, 596 U. S. 450,
458 (2022).

The enumerated "actions" in § 7607(b)(1) make clear that
this provision "treats each activity the Clean Air Act allows
the EPA to take as a distinct 'action.'" *Kentucky*, 123
F. 4th, at 460. These "actions" all refer to particular exer-
cises of EPA authority undertaken pursuant to particular
CAA provisions. For instance, the example of a NAAQS
must be understood by reference to § 7409(a), which directs
EPA to issue a NAAQS "for each air pollutant," and thus
indicates that each pollutant-specific standard is its own "ac-
tion." Likewise, § 7607(b)(1)'s example of EPA's approval of
an "implementation plan under section 7410" must be read
in light of § 7410, which makes clear that an implementation
plan is a proposal "submitted by a State," and thus indicates
that EPA's approval decision is state specific. § 7410(a)(2).
In each case, the enumerated EPA "action" is defined by ref-

erence to the substantive authority under which EPA is acting.　See *id.*, at 461.

Accordingly, for both §7607(b)(1)'s enumerated examples and "any other . . . final action taken" by EPA "under this chapter," we must look to the authorizing CAA provision to identify the "action" at hand.　This provision makes the CAA's framing of the relevant "action" controlling, regardless of how EPA chooses to package its decisions in the Federal Register.[2]

2

The next question is whether a given action is "nationally applicable" or only "locally or regionally applicable."　Because §7607(b)(1) does not define those terms, we presumptively give those terms their ordinary meaning.　*Burrage* v. *United States*, 571 U. S. 204, 210 (2014).　The word "'[n]ational' contemplates an activity with a nationwide scope," while the words "local" and "regional" relate only to particular "place[s]" or regions.　See Black's 845, 923.　And, the word "applicable" requires us to ask what the EPA action in question "'ha[s] reference to.'"　*Kentucky*, 123 F. 4th, at 459.　Put another way, we ask whether the action "[o]n its face" applies throughout the entire country, or only to particular localities or regions.　*Sierra Club* v. *EPA*, 926 F. 3d 844, 849 (CADC 2019).

The statutory context supplied by §7607(b)(1)'s enumerated examples confirms the correctness of this ordinary-meaning approach.　The actions that §7607(b)(1) identifies as "nationally applicable" facially apply nationwide.　For example, courts have identified a NAAQS—a "'*national* primary or secondary ambient air quality standard'"—as "[t]he textbook example of nationally applicable action."　*Sierra Club* v. *EPA*, 47 F. 4th 738, 743 (CADC 2022).　Conversely,

---

[2] The Fifth Circuit therefore erred in summarily accepting EPA's characterization of its omnibus notices as the "two EPA actions" at issue in this case.　86 F. 4th 1121, 1129 (2023); see *supra*, at 635.

the actions that the CAA enumerates as "locally or regionally applicable" all have more particularized reach. For instance, "the prototypical 'locally or regionally applicable' action" is EPA's approval of a state implementation plan, which, as explained, is state specific. *American Road & Transp. Builders Assn.* v. *EPA*, 705 F. 3d 453, 455 (CADC 2013) (majority opinion of Kavanaugh, J.); *supra*, at 637. Because catchall "clauses are to be read as bringing within a statute categories similar in type to those specifically enumerated," the examples make clear that the ordinary meaning of the terms "nationally applicable" and "locally or regionally applicable" controls. *Federal Maritime Comm'n* v. *Seatrain Lines, Inc.*, 411 U. S. 726, 734 (1973).[3]

3

Applying these principles here, we treat each EPA denial of a refinery's exemption petition as its own "action" for venue purposes. And, EPA's denial of a single refinery's petition plainly is only locally or regionally applicable.

This conclusion follows from how the CAA defines the submission and evaluation of an RFP exemption petition. The CAA allows "[a] small refinery" to "at any time petition [EPA] for an extension of [its] exemption" from RFP obligations. §7545(*o*)(9)(B)(i). EPA, in turn, is to "evaluat[e] a petition" and then "act on any petition submitted . . . not later than 90 days after the date of receipt of the petition." §§7545(*o*)(9)(B)(ii)–(iii). Thus, the CAA pegs EPA's "ac-

---

[3] Because 42 U. S. C. §7607(b)(1) requires all actions to be either nationally applicable or locally or regionally applicable, difficult edge cases may arise. For example, if an EPA action must "formally appl[y]" to "the whole country" to be nationally applicable, *Kentucky* v. *EPA*, 123 F. 4th 447, 460 (CA6 2024), then actions could apply to nearly the entire country yet still be locally or regionally applicable, see, *e. g.*, §7545(i)(4). But, if an action that formally applies to only a subset of the country can be nationally applicable, see *ATK Launch Systems, Inc.* v. *EPA*, 651 F. 3d 1194, 1197 (CA10 2011), then line-drawing questions may arise, *Kentucky*, 123 F. 4th, at 460–462. This case, however, does not present these issues.

tions" under the exemption provision by reference to each individual exemption petition.

Against this backdrop, our classification decision is straightforward. By definition, EPA's denial of a single refinery's exemption petition only applies to that refinery, which is a particular entity located in a particular place. That limited reach makes EPA's denials paradigmatically "locally or regionally applicable" actions. See *Sierra Club*, 926 F. 3d, at 849.

B

We are unpersuaded by EPA's and the intervenors' counterarguments. EPA proffers its omnibus denial notices as the relevant "actions" on the ground that it has the discretion to structure its decisions. According to EPA, it is free to "aggregate similar petitions for joint resolution" in a single "action"—here, its omnibus Federal Register notices—given its right as an agency "'to fashion [its] own rules of procedure and to pursue methods of inquiry capable of permitting [it] to discharge [its] multitudinous duties.'" Brief for Petitioner 26–27 (quoting *FCC* v. *Pottsville Broadcasting Co.*, 309 U. S. 134, 143 (1940)). But, whatever discretion EPA has to manage its internal affairs, Congress conclusively defined the term "action" in § 7607(b)(1) to focus on the specific statutory authority EPA is exercising.

Tellingly, EPA's position that it can control the unit of "action" used to determine venue lacks any statutory limiting principle. If EPA had free rein to group decisions into a single "action" for venue purposes, then it could bundle even unrelated matters into one Federal Register pronouncement that is, in the aggregate, nationally applicable. Such a possibility would effectively give EPA a veto power over venue under the CAA. We see no reason to read § 7607(b)(1) to permit such gamesmanship. Absent indication that Congress meant to give a party unfettered control over venue, we will not read a venue provision to confer such broad discretion. Cf. *Deal* v. *United States*, 508 U. S. 129, 133–134

(1993) (disfavoring a reading that would "give a prosecutor unreviewable discretion" as to a sentencing enhancement's applicability).

Because EPA does not dispute that the actions here can be nationally applicable only if it is right that the omnibus denial notices are the relevant "actions," we need not resolve EPA's remaining arguments. At a minimum, however, we note that EPA's theory for distinguishing between nationally applicable and locally or regionally applicable actions cannot withstand scrutiny. EPA argues that any agency action is nationally applicable if it affects more than one Circuit. But, as we have recognized, the term "nationally applicable" bears its ordinary meaning, *supra*, at 638, and EPA's view would render actions with a plainly local or regional focus "nationally applicable" simply because the locality or region at issue straddles Circuit lines. For example, some EPA air quality control regions cover metropolitan areas that extend into two Circuits. It would defy credulity to say that an EPA action regarding such a region would therefore be nationally applicable rather than locally or regionally applicable. Cf. Brief for Small Refinery Respondents 41 ("Can there be any doubt that an EPA disapproval of a regional implementation plan for only Region 90 (Metropolitan Kansas City) is a 'regionally applicable' action . . . , even though that action touches both the Eighth and Tenth Circuits?"). Whatever the precise line should be, see n. 3, *supra*, EPA's line cannot be it.

EPA justifies its position based on §7607(b)(1)'s language equating regional Circuit review with review in "*the* appropriate circuit." §7607(b)(1) (emphasis added). To be reviewable only in a single "appropriate circuit," EPA contends, the category of "locally or regionally applicable" actions must be limited to those actions affecting only one Circuit. But, in the absence of other evidence, §7607(b)(1)'s use of the definite article "the" is too thin a reed to support EPA's conclusion. See 1 U. S. C. §1 (directing that "words

importing the singular include and apply to several persons, parties, or things" "unless the context indicates otherwise").

Finally, we find no merit in the intervenors' arguments for why the denial of an individual refinery's exemption petition should still be considered nationally applicable. According to the intervenors, the individual denials are nationally applicable because they have follow-on effects for the amount of renewable fuel that must be produced under the RFP and because EPA in issuing the denials announced a new standard for adjudicating exemption petitions. But, again, we determine an action's range of applicability by "look[ing] only to the face of the [action], rather than to its practical effects." *American Road & Transp. Builders Assn.*, 705 F. 3d, at 456. Any follow-on implications of EPA's denials have no bearing on our analysis of their facial applicability. Cf. *Sierra Club*, 47 F. 4th, at 744 ("The fact that 'EPA's interpretive reasoning' may have 'precedential effect in future EPA proceedings . . . does not make [an action] nationally applicable'").

## III

Because we conclude that EPA's actions were only locally or regionally applicable, we must proceed to the second step of the § 7607(b)(1) inquiry. That is, we ask whether the "nationwide scope or effect" exception applies to override the default of regional Circuit review for locally or regionally applicable actions. This exception channels an action to the D. C. Circuit if (1) it "is based on a determination of nationwide scope or effect," and (2) "in taking such action [EPA] finds and publishes that such action is based on such a determination." § 7607(b)(1). Here, all agree that the second requirement is satisfied: EPA included the necessary finding in both its April and June denial notices. *Supra*, at 634–635. Accordingly, the question before us is whether EPA's exemption denials were "based on a determination of nationwide scope or effect." We conclude that they were.

### A

Here too, we begin by laying out the framework for deciding whether an action is "based on a determination of nationwide scope or effect." We conclude that this requirement is met if such a determination supplies a core justification for EPA's action and that courts should evaluate the basis for EPA's determinations *de novo*. Applying that framework, we hold that this case is one in which the "nationwide scope or effect" exception applies.

### 1

To understand the phrase "based on a determination of nationwide scope or effect," we again turn to ordinary meaning. *Burrage*, 571 U. S., at 210. In particular, we look to the plain meaning of this phrase's component words, which are all terms of everyday usage. And, we read these words "in their context and with a view to their place in the overall statutory scheme." *Davis* v. *Michigan Dept. of Treasury*, 489 U. S. 803, 809 (1989).

To begin, a "determination" is the "settling and ending of a controversy," or "the resolving of a question by argument or reasoning." Webster's 616; see also 4 Oxford English Dictionary 548 (2d ed. 1989) ("[t]he decision arrived at or promulgated; a determinate sentence, conclusion, or opinion"). In an EPA action, EPA's underlying "determinations are the justifications [it] gives for the action," which "can be found in [its] explanation of its action." *Texas* v. *EPA*, 829 F. 3d 405, 419 (CA5 2016).

In turn, a determination's "scope" and "effect" refer, respectively, to its "formal 'area' of operation" and to its " 'operative influence.' " *Kentucky*, 123 F. 4th, at 465; see, *e. g.*, American Heritage Dictionary 1164 (1969) (defining "scope" as the "area covered by a given activity or subject"); Webster's 724 (defining "effect" as "something that is produced by an agent or cause"). An agency's determinations are of

"nationwide" scope or effect if they apply "throughout [the] entire nation." *Id.*, at 1505. Taken together, an agency action involves determinations of nationwide "scope" if they apply throughout the country "as a legal matter (de jure)" and determinations of nationwide "effect" if they so apply "as a practical one (de facto)." *Kentucky*, 123 F. 4th, at 465.

Of course, nearly all agency actions can be said to involve justifications of nationwide reach or consequence. For example, most EPA actions presumably rely on EPA's interpretations of its governing statutes.

The key question, then, is the degree of causality contained in the phrase "based on." And, the meaning of that phrase is context dependent. In many cases, it "indicates a but-for causal relationship." *Safeco Ins. Co. of America* v. *Burr*, 551 U. S. 47, 63 (2007). But-for causation is a comparatively lenient standard, which is met so long as a result "would not have occurred in the absence of—that is, but for—[a party's] conduct." *Burrage*, 571 U. S., at 211 (internal quotation marks omitted). In other cases, however, more is needed. Congress sometimes uses phrases such as "based on" to cover only "core" causes amounting to an action's "*sine qua non*" or "'gravamen.'" See, *e. g.*, *Fry* v. *Napoleon Community Schools*, 580 U. S. 154, 167, 169 (2017); *OBB Personenverkehr AG* v. *Sachs*, 577 U. S. 27, 35 (2015).

Section 7607(b)(1) incorporates the more demanding, "core" understanding of "based on." This constraint follows from the function of the "nationwide scope or effect" exception as just that—an exception. Congress, after all, is unlikely to intend for an exception to swallow the rule. See *Smith & Wesson Brands, Inc.* v. *Estados Unidos Mexicanos*, 605 U. S. 280, 298–299 (2025). Thus, in this context, but-for causation is inadequate: In almost any case, a determination of nationwide scope or effect will be at least a but-for cause of EPA's action, given that any EPA action is downstream of EPA's conclusions as to what its governing statutes permit or require. But, Congress made regional Circuit review the

default for locally or regionally applicable actions, so we must read the "nationwide scope or effect" exception in a way that preserves regional Circuit review as the norm.

It follows that an EPA action is "based on" a particular determination only if that determination "lie[s] at the core of the agency action," so as to form the most important part of the agency's reasoning. *Texas*, 829 F. 3d, at 419. Put more concretely, an EPA action is based on a determination of nationwide scope or effect only if a justification of nationwide breadth is the primary explanation for and driver of EPA's action. A determination of nationwide scope or effect does not rise to this level if EPA also relied in significant part on other, "intensely factual" considerations, or if the key driver of EPA's action is otherwise debatable. *Id.*, at 421; see also *id.*, at 419 ("The default presumption is that petitions for review of locally or regionally applicable actions 'may only be filed in the United States Court of Appeal for the appropriate circuit'").

2

In deciding whether a particular EPA action is "based on a determination of nationwide scope or effect," courts should assess EPA's reasoning *de novo*. This standard follows from the structure of the "nationwide scope or effect" exception: The exception applies only "*if*" a locally or regionally applicable action is based on a determination of nationwide scope or effect "*and if*" EPA, in taking the action, finds and publishes that the action has this basis. § 7607(b)(1) (emphasis added). In other words, the CAA requires both that EPA deem its action to have a qualifying basis and that the action in fact have this basis. This dual formulation does not naturally suggest that courts should simply give EPA's finding deference. Cf. *Regalado Cuellar* v. *United States*, 553 U. S. 550, 565 (2008) (finding it "implausible" to infer that Congress intended a particular meaning, where it used a "more complex formulation").

The upshot is that courts must "make an independent assessment of the scope of [EPA's] determinations." *Texas*, 829 F. 3d, at 421. That is, they should parse the reasoning offered by EPA in taking an action to decide which determinations primarily drove the action. Courts routinely analyze filings to identify their substance, and the language of the "nationwide scope or effect" exception directs them to do the same here.

In so holding, we do not downplay the importance of EPA's role. Because the "nationwide scope or effect" exception can apply only when "EPA so finds and publishes" that it does, EPA can decide whether the exception is even potentially relevant. *Sierra Club*, 47 F. 4th, at 746. And, where EPA does invoke the exception, its explanation for doing so will at a minimum focus the courts' assessment of the possible determinations of nationwide scope or effect.[4] Thus, EPA's choices will matter, even as courts must assess the bases for EPA's actions themselves.

3

Applying this framework, we conclude that EPA's denials of the small refineries' exemption petitions were based on determinations of nationwide scope or effect. We agree with EPA's finding—published in both its April and June denial notices—that its interpretation of the phrase "disproportionate economic hardship" under § 7545(*o*)(9)(B)(i) and its RIN passthrough theory were determinations of nationwide

---

[4] This case does not present the question whether, given principles of issue preservation, courts can forgo consideration of determinations that EPA has not itself identified as the basis for its action. Cf. *SEC* v. *Chenery Corp.*, 318 U. S. 80, 88 (1943) (confining review of agency action "to a judgment upon the validity of the grounds upon which the [agency] itself based its action"). But, we expect this issue to be outcome dispositive only in rare cases. As a practical matter, an action is unlikely to be based on a particular determination where EPA has failed, in promulgating the action, to identify that determination as the relevant determination of nationwide scope or effect.

scope or effect that formed the core basis for EPA's denials. *Supra*, at 634–635.

Both conclusions are clear determinations of nationwide scope or effect: EPA invoked both its statutory interpretation and its passthrough theory in justifying its denials, and both points apply generically to all refineries, regardless of their geographic location. After all, the CAA is a federal statute, and §7545(*o*)(9)(B)(i) by its terms applies nationwide. Likewise, EPA's RIN passthrough theory is a finding about how the national refinery market works. See *supra*, at 634.

These conclusions also can be deemed the "basis" for EPA's denials here. EPA decided, in light of the foregoing determinations, that it would presumptively deny all the exemption petitions before it. *Supra*, at 634. It then considered other, refinery-specific considerations only to confirm that it had no reason to depart from its presumptive disposition. *Supra*, at 634–635. In this posture, EPA's statutory interpretation and passthrough theory plainly are the most important parts of its reasoning. Or, put another way, where EPA relies on determinations of nationwide scope or effect to reach a presumptive resolution, those determinations qualify as the primary driver of its decision. EPA's confirmatory review of refinery-specific facts is "[m]erely peripheral" by comparison. *Texas*, 829 F. 3d, at 419.

Accordingly, we agree with EPA that the "nationwide scope or effect" exception applies here. The Fifth Circuit should have transferred this case.

B

We are unpersuaded by the counterarguments raised by EPA, respondents, the Fifth Circuit, and the dissent.

Although we agree with EPA's bottom-line position that the "nationwide scope or effect" exception applies, we reject its roundabout approach to the word "determination." EPA argues that "[t]he word 'determination'" in §7607(b)(1) "sug-

gests a resolution of an unsettled issue," such that EPA does not make "determinations" when it "applies a previously established agency rule, policy, or interpretation to new . . . circumstances." Brief for Petitioner 41. We agree with EPA that a "determination" here means the " 'settling and ending of a controversy,' " *ibid.*; *supra*, at 643, but nothing in that term or its use in § 7607(b)(1) suggests that only novel conclusions count. Rather, given § 7607(b)(1)'s focus on the face of the agency action, "determination" is most naturally read to cover any EPA conclusion within the four corners of an action.

Moreover, we do not see how EPA's proposed approach can be squared with its requested disposition. If a "determination" covers only the resolution of an unsettled issue, it is not obvious why EPA's June denials contain any determinations: EPA's June notice purported to "appl[y] the approach . . . adopted in the April" notice. App. to Pet. for Cert. 80a. EPA attempts to avoid this difficulty by proposing a holistic assessment of novelty that considers factors such as "whether EPA announced the rule or policy at roughly the same time as the challenged agency action itself." Brief for Petitioner 41. But, we do not see how this amorphous test follows even from EPA's view.[5]

Respondents argue that the word "determination" in § 7607(b)(1) is a term of art, wherein an agency action can trigger the "nationwide scope or effect" exception only if it is undertaken based on a CAA provision that "textually direct[s] EPA to make a 'determination' for the entire nation." Brief for Small Refinery Respondents 32 (emphasis deleted). But, "determination" is "hardly a rarely used word," and nothing in the CAA's context suggests that Congress meant

---

[5] EPA also contends that § 7607(b)(1)'s "based on" language speaks in terms of but-for causation and that courts should assess the basis for EPA's actions deferentially, through arbitrary-and-capricious review. For the reasons already explained, we reject those contentions. *Supra*, at 644–645.

for its use in § 7607(b)(1) to reach only CAA provisions that happen to use some variant of that word. *Bruesewitz* v. *Wyeth LLC*, 562 U. S. 223, 235 (2011). Such a limitation would at best lead to arbitrary outcomes, as Congress did not act in a standardized way when using "determination" as opposed to other words. Compare § 7410(k)(3) (not speaking in terms of "determinations") with § 7410(k)(6) (requiring a "determination" when EPA "[c]orrect[s]" its actions under § 7410(k)(3)). At worst, respondents' approach would render the "nationwide scope or effect" exception meaningless: Respondents have conceded that their term-of-art view may render the exception "a null set, or close to a null set." Tr. of Oral Arg. 103–104. But, Congress would not have gone to the trouble of creating a superfluous exception, so we will not "force [a] term-of-art definitio[n]" where it "plainly do[es] not fit." *Gonzales* v. *Oregon*, 546 U. S. 243, 282 (2006) (Scalia, J., dissenting).

The dissent would similarly limit the "nationwide scope or effect" exception to reach only statutorily enumerated determinations, but its arguments fare no better. The dissent highlights that various CAA substantive provisions require EPA to make particular "determinations" before taking an action. *Post*, at 653–655, 659–660 (opinion of GORSUCH, J.). But, it does not follow that Congress meant to encompass only statutorily enumerated determinations when it spoke generally in the exception of actions "based on *a determination* of nationwide scope or effect." § 7607(b)(1) (emphasis added). And, although some statutes " 'distinguis[h] between "considerations" that inform [a] "determination" and the "determination" itself,' " *post*, at 659–660 (quoting *Commissioner* v. *Zuch*, 605 U. S. 422, 429 (2025); alterations in original), statutes like the one in *Zuch* use "determination" to refer to an agency's ultimate decision, see *id.*, at 428–429. In asking whether a determination supplies the basis for an EPA action, § 7607(b)(1) uses the term in a different sense. Likewise, the dissent's concern that our test could be difficult for

"lower courts and lawyers to apply" is not a problem of our creation. *Post*, at 660. Insofar as the reticulated venue framework that Congress enacted creates difficulty for courts or litigants, "it is a problem for Congress, not one that federal courts can fix." *Lewis* v. *Chicago*, 560 U. S. 205, 217 (2010).

Finally, we are unpersuaded by respondents' argument, accepted by the Fifth Circuit, that the "nationwide scope or effect" exception is inapplicable in light of EPA's consideration of refinery-specific facts. That exception requires that an EPA action be "based on" a determination of nationwide scope or effect, in contrast to another part of § 7607(b)(1) where Congress used the phrase "based solely on." Accordingly, EPA's consideration of local facts does not preclude its invocation of the exception, either generally or here. So long as a determination of nationwide scope or effect served as the primary driver of EPA's action, other, more "peripheral" determinations "are not relevant" for venue purposes. *Texas*, 829 F. 3d, at 419.

*      *      *

We agree with the Fifth Circuit that EPA's actions here are only locally or regionally applicable, although we clarify that the relevant actions are EPA's individual denials of the small refineries' exemption petitions. But, under a proper understanding of § 7607(b)(1), the "nationwide scope or effect" exception applies, and the case belongs in the D. C. Circuit. The Fifth Circuit therefore erred in denying EPA's request to transfer. The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE GORSUCH, with whom THE CHIEF JUSTICE joins, dissenting.

Though I would reach a different judgment, the Court and I travel much of the way together. This case involves six

GORSUCH, J., dissenting

small refineries. Each petitioned the Environmental Protection Agency for a hardship exemption from the Clean Air Act's renewable fuel mandates. The agency denied all six refineries' petitions. The question we face does not concern the merits of what EPA did, only where the small refineries' lawsuit challenging the agency's actions should be heard. The Act instructs that litigation over "nationally applicable" EPA "actions" belongs in the D. C. Circuit, while disputes over "locally or regionally applicable" agency "actions" generally belong in a regional circuit. 42 U. S. C. § 7607(b)(1). In Parts I and II of its opinion, the Court concludes that these rules presumptively route the dispute before us to a regional circuit because EPA's decision to deny an individual refinery's petition for a hardship exemption is a "locally or regionally applicable" action. With all that, I agree.

But then, in Part III of its opinion, the Court pivots. Even when a case challenges only a "locally or regionally applicable" action, the Court observes, the Act routes it to the D. C. Circuit if EPA's action "is based on a determination of nationwide scope or effect." Applying a new multistep test it announces, the Court concludes that EPA's actions at issue here were based on such a determination. As a result, the Court holds, the right venue for this case turns out to be the D. C. Circuit after all.

In my view, that pivot is a mistake. The Clean Air Act's venue provision works in harmony with its substantive provisions. Throughout, those substantive provisions direct EPA to make certain "determinations" before it may take certain "actions." When it comes to acting on a small refinery's hardship petition, nothing in the Act's substantive provisions calls on EPA to make a "determination of nationwide scope or effect." Instead, the Act requires the agency to evaluate only whether a particular small refinery seeking an exemption would suffer a hardship without one. Accordingly, the Act's venue provision routes this dispute to a regional circuit, just as the Fifth Circuit recognized below.

The Court's new and reticulated test for assessing venue disputes under the Act strikes me as both mistaken and likely to render simple venue questions unnecessarily difficult and expensive to resolve.

I

Start with how I would analyze this case. The Clean Air Act's venue provision, found in 42 U. S. C. § 7607(b)(1), supplies three basic rules. First, challenges to "nationally applicable" agency "action[s]" must be brought in the D. C. Circuit. Second, challenges to "locally or regionally" applicable agency "action[s]" must be filed in the appropriate regional circuit. Third, as an exception to the second rule, challenges to locally or regionally applicable agency actions belong in the D. C. Circuit if they are "based on a determination of nationwide scope or effect."[1] The central question this case poses concerns the relationship between the second and third rules: When is a locally or regionally applicable "action" under the Clean Air Act "based on a determination of nationwide scope or effect"?

As I see it, the Act itself supplies the answer. Working in concert with the Act's venue provision, the Act's substantive provisions tell us what kinds of "actions" the agency is lawfully authorized to take and when those actions may be based on "determinations of nationwide scope or effect." Here, the relevant substantive provisions permit EPA to take a specific "action"—namely, the granting or denying of a small refinery's hardship petition. But, by their terms, those provisions do not call for a nationwide "determination" when the agency acts. Instead, the only decisions EPA must make are refinery-specific ones. Accordingly, the dispute before us belongs in an appropriate regional circuit.

———

[1] To implicate this exception, EPA must also certify its belief that its action "is based on . . . a determination" of nationwide scope or effect. § 7607(b)(1). But that requirement is irrelevant in this case because all agree that EPA satisfied it, so I will not address it further. *Ante*, at 642.

A

To appreciate how the Act's substantive and venue provisions interact, begin with a look at the substantive provisions addressing the renewable fuel standards that lie at the heart of this case.

As a rule, §7545(*o*)(2) requires the Nation's fuel supply to include ethanol or other renewable fuels in fixed amounts that increase over time. See *HollyFrontier Cheyenne Refining, LLC* v. *Renewable Fuels Assn.*, 594 U. S. 382, 385–386 (2021). But the Act also permits EPA to take various actions inconsistent with that general rule if it makes certain determinations. So, for example, §7545(*o*)(7)(A)(i) allows EPA to waive some renewable fuel mandates "based on a determination" that enforcing them "would severely harm the economy or environment of a State, a region, or the United States." Similarly, EPA may waive renewable fuel requirements "based on a determination . . . that there is an inadequate domestic [fuel] supply." §7545(*o*)(7)(A)(ii). Similarly again, §§7545(c)(4)(C)(ii) and (iii) permit EPA to waive other standards if it "determines that . . . extreme and unusual . . . circumstances exist in a State or region." Beyond those examples, §7545 discusses various other actions the agency may take after making various other determinations. (In all, §7545 uses the word "determination" or one of its cognates more than 70 times.)

Now apply these observations about §7545's substantive provisions to the Act's venue provision. If, for example, EPA waives a renewable fuel standard for a single State under §7545(*o*)(7)(A)(i) "based on a determination" that "implement[ing]" those standards "would severely harm the economy . . . of a State," §7607(b)(1) would route disputes over that action to the appropriate regional circuit. After all, a determination about the economy of a particular State is hardly one of "nationwide scope or effect." §7607(b)(1). On the other hand, if EPA issues such a waiver based on a "determination" that implementing the renewable fuel stand-

ard in question "would severely harm the economy [of] the United States," § 7607(b)(1) would channel any litigation over that action to the D. C. Circuit.

The substantive provisions at issue in today's companion case illustrate the same point. That litigation revolves around federal air quality standards and the State Implementation Plans (SIPs) States must prepare to meet them. See *Oklahoma* v. *EPA*, 605 U. S. 609, 615 (2025). Section 7410 sets forth the general rules about what SIPs must contain and how EPA must go about assessing them. But that section also authorizes EPA to take certain actions inconsistent with those rules after making certain determinations. (For its part, § 7410 uses "determination" or one of its cognates more than 20 times.) So, for example, § 7410(b) permits EPA to "extend the period for [the] submission of any" SIP for up to 18 months "wherever [the EPA Administrator] determines necessary." And § 7410(g) allows EPA to "disapprov[e]" a Governor's decision to suspend a SIP component if the agency "determines" that his decision "does not meet" certain statutory criteria (including whether the suspension is necessary "to prevent substantial increases in unemployment").

Now consider where the Act's venue provision sends disputes about EPA actions under these substantive provisions. Suppose EPA determines that it is "necessary" to extend the submission deadline for SIPs across the country, and the agency acts accordingly pursuant to § 7410(b). In those circumstances, an argument might be made that § 7607(b)(1) routes disputes about that action to the D. C. Circuit. Cf. *Kentucky* v. *EPA*, 123 F. 4th 447, 466 (CA6 2024). But if EPA acts pursuant to § 7410(g) to countermand a Governor's decision to suspend a SIP component based on a determination that his decision defies the Act's terms, § 7607(b)(1) would likely send any dispute over that action to a regional circuit.

GORSUCH, J., dissenting

### B

With that much in hand, return to the question whether the Act's venue provision directs this lawsuit to a regional circuit or the D. C. Circuit.

As we have seen, § 7545 lays out the Act's substantive renewable fuel standards and generally requires refineries to mix a certain (and regularly increasing) amount of renewable fuels into the transportation fuel they produce. See Part I–A, *supra*; *HollyFrontier*, 594 U. S., at 385–386. But § 7545 also allows EPA to exempt small refineries from these mandates "for the reason of disproportionate economic hardship." § 7545(*o*)(9)(B)(i). Seeking to take advantage of this provision, the six small refineries before us individually petitioned EPA for hardship exemptions. See 86 F. 4th 1121, 1129–1130 (CA5 2023). In the end, the agency denied each refinery's request. App. to Pet. for Cert. 251a–252a; *id.*, at 305a–310a. Now, the small refineries seek to challenge EPA's actions in court. That challenge belongs in a regional circuit because nothing in the Act's relevant substantive provisions calls for EPA to act on a determination of nationwide scope or effect.

Just walk through the substantive provisions addressing small refineries one by one. To account for the fact that small refineries may have more difficulty meeting evolving renewable fuel mandates than their larger rivals, Congress in 2005 granted them a blanket exemption until 2011. See § 7545(*o*)(9)(A); *HollyFrontier*, 594 U. S., at 386–387. After that, Congress directed EPA to extend a small refinery's exemption "for a period of not less than 2 additional years" if the "Secretary of Energy determines" that the refinery in question "would be subject to a disproportionate economic hardship if required to comply" with the Act's renewable fuel mandates. § 7545(*o*)(9)(A)(ii)(II). Even beyond that, Congress permitted a small refinery to petition "at any time" for "an extension" of its "exemption . . . for the reason of

disproportionate economic hardship." § 7545(*o*)(9)(B)(i). When it comes to deciding whether to grant or deny such a petition, the Act directs EPA to "consul[t] with the Secretary of Energy," consider his "determin[ation]" whether "a" particular "small refinery" would suffer "disproportionate economic hardship if required to comply," and consider "other economic factors." §§ 7545(*o*)(9)(A)(ii), (B)(ii). Nowhere does the Act call for a determination of nationwide scope or effect. To the contrary, after the blanket exemption for small refineries expired in 2011, all agency actions and determinations became refinery-specific ones.

Any doubt on that score is resolved by comparing these substantive provisions with others we have encountered. Section 7545(*o*)(7)(A), remember, allows EPA to waive certain renewable fuel standards "based on a determination . . . that implementation of the requirement would severely harm the economy or environment of . . . the United States," or "based on a determination . . . that there is an inadequate domestic [fuel] supply." As that provision illustrates, when it wished to do so, Congress knew how to say that EPA may take a certain action based on a determination of nationwide scope or effect. That we have nothing like that here is a telling sign that the small-refinery provisions work differently and do not task EPA with taking any nationally applicable action or making any determination of nationwide scope or effect. See *Feliciano* v. *Department of Transportation*, 605 U. S. ——, —— (2025).

EPA's own statements convey the same message. The agency represents that it "'consider[s] each petition on the merits'" and examines "'individual refinery information'" when passing on individual hardship petitions. 86 F. 4th, at 1133. EPA represents, too, that it "determined that none of the petitioning small refineries" merited a hardship exemption only after completing "a thorough evaluation of the data and information provided" by each small refinery. Brief for Petitioner 10; App. to Pet. for Cert. 94a–95a.

GORSUCH, J., dissenting

To be sure, EPA also highlights two features of its administrative proceedings that, it says, prove the agency took a "nationally applicable action," or at least made a "determination of nationwide scope or effect." For one, EPA emphasizes that it bundled the petitions from the six small refineries before us together with a host of other similar petitions and dispatched them all in a pair of administrative decisions. See Brief for Petitioner 28; 86 F. 4th, at 1129–1130. For another, the agency stresses that, in evaluating each refinery's petition, it relied on a single interpretation of the statutory phrase " 'disproportionate economic hardship' " and a single economic model (the agency's "RIN passthrough theory"). *Ante*, at 634.

The Court correctly holds that none of this transforms EPA's challenged actions into "nationally applicable" actions. *Ante*, at 640. Yes, the agency may choose to bundle petitions together for administrative convenience. And, yes, the agency may apply similar reasoning when faced with similar petitions. But, as the Court recognizes, the only "action" the Act's substantive provisions call on EPA to take is to grant or deny an individual hardship petition—and that is a locally applicable action, not a national one. *Ibid.*

As I see it, this same insight defeats EPA's suggestion that its actions were "based on a determination of nationwide scope or effect." §7607(b)(1). As a matter of administrative convenience, the agency may choose to address a number of petitions collectively rather than separately. And the agency of course may (and, to avoid acting arbitrarily and capriciously, generally must) apply consistent reasoning to like petitions. But the Act's venue provision does not route cases to one circuit or another based on how EPA packages them or the quality or nature of its reasoning. Instead, the Act's venue provision asks whether the agency based its action on a determination of nationwide scope or effect. And, as the Act's substantive provisions make clear, EPA does no such thing when it passes on an individual small refinery's hardship petition.

## II

Turn now to how the Court resolves this case. As we have seen, the Court first holds that EPA's decision whether to grant or deny an individual small refinery's hardship petition is a locally or regionally applicable "action." See Part II, *ante*. Accordingly, the Court starts with the (correct) presumption that the suit before us belongs in a regional circuit. *Ibid.* But then, the Court reverses course. While EPA's challenged actions are local or regional ones, the Court concludes, this case belongs in the D. C. Circuit because the agency's actions were "based on a determination of nationwide scope or effect." See Part III, *ante*. That portion of the Court's opinion strikes me as both mistaken and likely to cause confusion about where Clean Air Act disputes should be heard.

To understand why, consider how the Court proceeds. Pursuing what it calls an "ordinary-meaning" approach, the Court observes that the word "determination" often refers to the " 'settling and ending of a controversy.' " *Ante*, at 643 (quoting Webster's Third New International Dictionary 616 (1976)). Extrapolating from that dictionary definition, the Court reasons that "*any EPA conclusion* within the four corners of an action" qualifies as a "determination." *Ante*, at 648 (emphasis added).

But, the Court continues, whether an action is " 'based on' " a conclusion of nationwide scope or effect depends on a "degree of causality." *Ante*, at 644. Nor will just any degree of causality do. Proving that some nationwide conclusion (or now, the Court adds, "justification" or "reasoning") is the "but-for" cause of the agency's action will not suffice. *Ante*, at 644–645. Instead, EPA must establish that some nationwide conclusion (or justification or reasoning) qualifies as the "gravamen" or "core" or "driver" of its action. *Ibid.* (internal quotation marks omitted). And when EPA's actions rely "in significant part on . . . 'intensely factual' considerations" or when "the key driver of EPA's

action is otherwise debatable," that standard will not be satisfied. *Ante*, at 645.

Applying all those ideas to this case, the Court holds that all of EPA's challenged actions were based on a determination of nationwide scope or effect. That is so, the Court says, because EPA's actions (its decisions to deny the small refineries' petitions) rested at their "core" on a common (or "nationwide") understanding of the statutory phrase " 'disproportionate economic hardship' " and a common (or "nationwide") economic model. *Ante*, at 646–647 (quoting § 7545(*o*)(9) (B)(i)). To be sure, the Court acknowledges, the agency also undertook a "review of refinery-specific facts." *Ante*, at 647. But on the Court's account, those "refinery-specific facts" mattered less to the outcomes here than EPA's statutory interpretation and its economic model. *Ibid.*

I find that chain of reasoning unpersuasive for a few reasons. For one thing, it seems to me pretty far afield from the statutory text. As we have seen, the Clean Air Act's venue provision speaks of actions and determinations, and the Act's substantive provisions do too. And when a substantive provision calls for either a nationally applicable "action" or a "determination" of nationwide scope or effect, it says so. To decide where a case belongs, then, no special judicially devised test is required. Instead, lawyers and judges need only open the statute books, find the relevant substantive provision, and follow its lead. As we have seen, the Court takes just this approach when addressing the meaning of the term "action" in the Act's venue provision. There, it concludes EPA took no nationally applicable "action" because the Act's substantive provisions "pe[g]" an action to a decision to grant or deny an individual hardship petition. *Ante*, at 639–640; see Part I–B, *supra*. On my view, we should employ that same statute-driven approach to the meaning of "a determination of nationwide scope or effect."

For another thing, the Court's test conflates a determination with the reasons that inform it. Statutes often "distin-

guis[h] between 'considerations' that inform [a] 'determination' and the 'determination' itself." *Commissioner* v. *Zuch*, 605 U. S. 422, 429 (2025) (alteration omitted). The Clean Air Act is no different. It authorizes EPA to take certain actions (like waiving renewable fuel mandates or disapproving a single Governor's suspension of a SIP component). The Act authorizes those actions if certain determinations are made (like a determination that enforcing the renewable fuel mandates would severely harm the national economy or a determination that a Governor's partial SIP suspension doesn't satisfy certain criteria). And to support its determinations, the agency may offer any number of reasons. To avoid accusations of arbitrary and capricious decisionmaking, too, the agency will usually employ consistent reasoning in like cases. See, *e. g.*, *Encino Motorcars, LLC* v. *Navarro*, 579 U. S. 211, 222 (2016). But none of that means we should conflate the determinations EPA must make under the Act with the reasons the agency offers to support them.

For another thing still, I worry that the Court's test will prove tough for lower courts and lawyers to apply in practice. Having conflated a "determination" with the agency's underlying reasoning, the Court must find some way to go about sorting and weighing all the reasons EPA may advance. But just consider what its approach entails. First, lawyers and judges must consult the full scope of the agency's reasoning (in this case, reasoning that runs over 280 pages). See App. to Pet. for Cert. 44a–330a. Next, lawyers and judges must "parse" out which aspects of that reasoning are particular to a locality or region and which are national in scope or effect. *Ante*, at 646. Finally, lawyers and judges must weigh those two sets of reasons against each other and decide which set was the true "driver" of the agency's decision and which was more "peripheral" to it. *Ante*, at 647 (internal quotation marks omitted).

GORSUCH, J., dissenting

" '[L]itigation over whether the case is in the right court is essentially a waste of time and resources.' "  *Navarro Savings Assn.* v. *Lee*, 446 U. S. 458, 464, n. 13 (1980).  When it comes to the simple preliminary question where a case should be filed, the rules of the road should be "clear and easy to apply."  *Hamer* v. *Neighborhood Housing Servs. of Chicago*, 583 U. S. 17, 25 (2017); see *Hertz Corp.* v. *Friend*, 559 U. S. 77, 94–95 (2010).  The test the Court announces today can claim neither of those virtues.  For the lawyers and judges tasked with applying it, I can only wish them luck.

## III

To get a sense of the challenges the Court's test poses for future litigants and lower courts, compare this case to its companion.  See *Oklahoma* v. *EPA*, 605 U. S. 609 (2025).

As we have seen, that dispute involves SIPs, plans States must submit to EPA outlining how they intend to comply with national air quality standards.  See Part I–A, *supra*; § 7410.  Among other things, a State's SIP must address the Act's "Good Neighbor Provision."  *Ohio* v. *EPA*, 603 U. S. 279, 283–284 (2024).  Because "air currents can carry pollution across state borders," *id.*, at 283, that provision requires each SIP to contain "adequate" measures to prevent in-state "emissions activity" from interfering with other States' ability to satisfy federal air quality standards, § 7410(a)(2)(D).  In a single rule, EPA rejected 21 SIPs—including Utah's and Oklahoma's—because, in the agency's view, none satisfied the Act's Good Neighbor provision.  *Oklahoma*, 605 U. S., at 616 (citing 88 Fed. Reg. 9336 (2023)).  Now, Oklahoma, Utah, and certain industry groups seek to challenge EPA's actions in court, and they argue that their litigation belongs in a regional circuit.  *Oklahoma*, 605 U. S., at 617.

EPA responds that the SIPs case is, in every way that matters, like the small refineries' case and thus belongs in the D. C. Circuit too.  After all, the agency points out, it

employed a common statutory interpretation and a common methodology to assess each State's proposed SIP—just as it did when considering the small refineries' petitions. If the one case belongs in the D. C. Circuit, EPA argues, so must the other. See Brief for Federal Respondents in No. 23–1067 etc., pp. 30, 34–36; Tr. of Oral Arg. in *Oklahoma* v. *EPA*, O. T. 2024, No. 23–1067 etc., pp. 39, 47.

Along those lines, EPA observes that, in assessing each SIP, it asked whether the state plan before it would contribute more than "1% of the permissible ozone level to a downwind State." *Oklahoma*, 605 U. S., at 624–625; Brief for Federal Respondents in No. 23–1067 etc., at 9, 35. In practice, EPA argues, that 1% threshold proved critical. SIPs that "fell under the 1 percent de minimis threshold" were "approved on [that] ground." Tr. of Oral Arg. in No. 23–1067 etc., at 38–39. Meanwhile, all (or nearly all) the SIPs that exceeded the 1% threshold—including Oklahoma's and Utah's—were rejected. See Brief for Federal Respondents in No. 23–1067 etc., at 7; Brief for State of New York et al. as *Amici Curiae* in No. 23–1067 etc., pp. 24–25, n. 20. Accordingly, the agency argues, even if it took a local or regional "action" with respect to each SIP, nationwide determinations proved "essential to EPA's reasoning in disapproving the state plans." Brief for Federal Respondents in No. 23–1067 etc., at 37.

The Court disagrees. As it must under the test it announces, the Court begins by consulting all the various reasons EPA offered (some 60-plus pages of them appear in the Federal Register). *Oklahoma*, 605 U. S., at 622–625.[2] In doing so, the Court acknowledges that EPA used a common (or nationwide) statutory interpretation and a common (or nationwide) methodology when assessing all of the SIPs. See *id.*, at 621. The Court recognizes, too, that the 1%

---

[2] See 88 Fed. Reg. 9336 (omnibus rule); 87 Fed. Reg. 31470 (2022) (Air Plan Disapproval; Utah); *id.*, at 9798 (Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas).

threshold played a significant role in separating the SIPs EPA approved from those it rejected. See *id.*, at 624–625. Still, when it comes to weighing the role that EPA's common (or nationwide) justifications played, the Court concludes, they were not the "primary drivers" of the agency's challenged actions. *Id.*, at 624. Instead, "factual determinations particular to the State at issue" predominated. *Id.*, at 622 (internal quotation marks omitted). Relying on that assessment, the Court holds that Oklahoma's and Utah's lawsuit challenging EPA's rejection of their SIPs belongs in a regional circuit. *Id.*, at 625.

Maybe that's right. But I can certainly imagine arriving at the opposite outcome under the Court's test. After all, EPA used a common statutory interpretation and a common methodology when assessing all of the SIPs, proceeding much as it did when evaluating the small refineries' hardship petitions. In both cases, too, the agency factored in certain local considerations, like individual "Stat[e] circumstances" in the SIPs case, *id.*, at 623, and individualized "data and information" in the small refineries' case, App. to Pet. for Cert. 94a–95a. Of course, the Court thinks EPA leaned more heavily on individualized reasons in the SIPs case, and more heavily on common ones in the small refineries' case. *Oklahoma*, 605 U. S., at 623–624. But without any objective standard for weighing which predominates, there seems to me ample room for good-faith disagreement between litigants and among lower courts. And it is just that kind of ambiguity that promises protracted and expensive venue litigation going forward.

To avoid that problem, I would resolve the SIPs case the same way I would resolve the small refineries' case: by looking to the Act itself. Section 7410(k)(3) requires EPA to approve or disapprove SIPs and, in passing on them, to assess whether each individual State has or has not complied with its obligations under federal law. See *id.*, at 615. Nowhere does that substantive provision call for a nationally applica-

ble action or task EPA with making a determination of nationwide scope or effect. And no more is needed to know that, under the Act's venue provision, the SIPs dispute before us belongs in a regional circuit. *Id.*, at 626 (GORSUCH, J., concurring in judgment).

\*

At the end of the day, venue rules are like traffic laws. They simply tell litigants where to go, and they should be easy to follow. As I read it, the Clean Air Act provides a clear rule for cases like this one. Applying that rule here, I would direct the parties to the appropriate regional circuit. The Court doing otherwise, I respectfully dissent.

## REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

None